**RIGHT TO READ DEFENSE COMMITTEE OF CHELSEA et al., Plaintiffs,**

v.

**SCHOOL COMMITTEE OF the CITY OF CHELSEA et al., Defendants.**

**Civ. A. No. 77–2318–T.**

United States District Court,
D. Massachusetts.

July 5, 1978.

Burnham, Sterns & Shapiro, Jonathan Shapiro, Boston, Mass., for plaintiffs.

Robert I. Tatel, Thomas D. Edwards, and Richard L. Dahlen, Boston, Mass., for defendants.

## OPINION

TAURO, District Judge.

At issue is the decision by a majority of the Chelsea School Committee (Committee) to bar from the High School Library an anthology of writings by adolescents entitled "Male and Female Under 18" (*Male &*

*Female* ). The Committee's action was prompted by a Chelsea parent's objection to the language in one selection, "The City to a Young Girl" (*City* ), a poem written by a fifteen year old New York City high school student.[1]

Plaintiffs[2] commenced this action against the Committee and the School Superintendent[3] on August 3, 1977 under 42 U.S.C. § 1983,[4] seeking an order requiring the anthology returned to the library intact. The essence of plaintiffs' position is that the Committee's action violated First Amendment rights of the High School's students,

faculty and library staff. The Committee defends its decision principally on the ground that its action in ordering the anthology removed was well within its statutory authority to oversee the curriculum and support services of the Chelsea High School.[5]

Following a contested hearing on plaintiffs' request for temporary restraining order, this court ordered the anthology returned intact to the library, and made available to students having written permission of parent or guardian.[6]

1. The text of the poem is as follows:
THE CITY TO A YOUNG GIRL
The city is
One million horney lip-smacking men
Screaming for my body.
The streets are long conveyor belts
Loaded with these suckling pigs.
All begging for
a lay
a little pussy
a bit of tit
a leg to rub against
a handful of ass
the connoisseurs of cunt
Every day, every night
Pressing in on me closer and closer.
I swat them off like flies
but they keep coming back.
I'm a good piece of meat.
     —Jody Caravaglia, 15, F.
     Brooklyn, New York

Although the poem is replete with street language, the defendants do not now contend that it is obscene within the meaning of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

2. Plaintiffs include Dorothea Filipowich, Lisa Jarvis and Sharon Ultsch, students at the High School; Walter and Barbara Ultsch, parents of a student plaintiff; Sonja Coleman, Librarian at the Chelsea High School; Danna Crowley, Chairwoman of the High School's English Department; Johanna Bartlett, an English teacher at the High School; the Right to Read Defense Committee of Chelsea, formed at the time of the School Committee action; and the Massachusetts Library Association.

The Massachusetts Library Association, and Walter and Barbara Ultsch, are dismissed from this action for lack of standing. All other plaintiffs have alleged a sufficient stake in the outcome of the litigation to warrant standing in this action.

3. The Committee is a seven member body that has statutory authority for administering the Chelsea public school system, Mass.Gen.Laws ch. 71, § 37 and Mass.Gen.Laws ch. 71, § 48.

At all times relevant to this litigation, defendant Andrew P. Quigley was the Committee's chairman, as well as owner and publisher of *The Chelsea Record*, that community's daily newspaper. Defendants Lucy Brown, Paul Kornechuk, Frances Montesano, Nancy Moore, Abraham Morochnick, and Anthony Tiro were members of the Committee. Defendant Vincent McGee was the Chelsea Superintendent of Schools.

4. 42 U.S.C. § 1983 states, in relevant part:
Every person who, under color of any statute . . . of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

5. Mass.Gen.Laws ch. 71, § 37 and Mass.Gen. Laws ch. 71, § 48.

6. The text of this court's August 19, 1977 temporary order is as follows:
"After hearing on the plaintiffs' motion for a temporary restraining order, the court ORDERS that the defendants, their officers, agents, servants, employees, attorneys, and all those in active concert with them shall be enjoined consistent with their stipulation recited at hearing.
1. from transferring or removing plaintiff Coleman from her position as librarian or from taking any other action against her in reprisal for having purchased *Male and Female Under 18* for the Chelsea High School library, for having protested defendants' action in censoring it, or for having joined in this action as a plaintiff; and
2. from transferring or removing plaintiff Crowley from her position as chairperson of the English Department and plaintiff Bartlett from her position as English teacher, or from taking any other action against them or against any of the student plaintiffs in repris-

Following several weeks of discovery, a six day bench trial and post trial submission of memoranda, the merits of the case were taken under advisement on March 21, 1978.

## I.

Chelsea High School has approximately 1200 students in grades nine through twelve. The English Department offers a wide variety of courses including Adolescent Literature, Hispano-American Literature, Poetry, Creative Writing, and Women in Literature. The English curriculum includes literature that, in street language, deals with such provocative themes as homosexuality, drug abuse, sexual experiences, and ghetto life. The High School Library facilities include approximately 7,400 volumes.

The librarian, Coleman, became interested in a reading program sponsored by the Prentice Hall Publishing Company that made available 1000 paperback books at an attractive cost. This collection of books was assembled by professional librarians and teachers for the purpose of stimulating student interest in reading. Coleman decided to purchase the Prentice Hall program, with the understanding that any titles unsuitable for the High School could be exchanged. She followed standard Chelsea procurement procedures in ordering the Prentice Hall collection. After they were delivered to the High School she reviewed all of them, although she was unable to read every page of all 1000 books.

The collection included the challenged *Male & Female*, which is an anthology of prose and poetry written by students aged 8 to 18. Coleman read the book's introduction and scanned its contents, but did not read *City*, the poem which is the subject of this litigation.

Coleman felt that *Male & Female* would be useful for students taking adolescent literature and creative writing courses, particularly because it would give them an opportunity to see the variety of ways in which other students expressed themselves. She recognized the anthology's two editors as highly regarded professionals, and the publisher, Avon Books, as having a good reputation in the area of young adult literature. These considerations, plus her own review, caused Coleman to place the anthology in the High School Library during March of 1976.[7]

On May 19, 1977, Committee Chairman Quigley received a telephone call from a parent of a high school student complaining about offensive language in *City* that was included in the volume *Male & Female* his daughter had borrowed from the High School Library. Quigley went that evening to the parent's home, obtained the volume and assured the parent that the incident would be carefully reviewed by the Committee. He later read the poem and concluded that *Male & Female* should be removed from the High School Library because of the "filthy" and "offensive" language in *City*. He made this determination without reading any other part of the anthology. The only person he consulted was the complaining parent.

The same evening Quigley scheduled an emergency meeting of the Committee for Monday, May 23, 1977, to consider the subject of "objectionable, salacious and obscene material being made available in books in the High School Library." He also wrote an article that evening that appeared the

al for having protested defendants' actions in censoring *Male and Female Under 18* or for having joined in this action as plaintiffs.

The court understands that this reflects the position of the defendant School Committee.

The court further ORDERS that the defendants shall immediately return the book *Male and Female Under 18* without any deletions to the custody of the librarian; and that, pending final determination of this suit, the librarian shall not permit access to the

book *Male and Female Under 18* to any student unless the student presents the librarian with written permission from his or her parent or guardian.

The court further ORDERS that a pre-trial conference will be held in this case on September 14, 1977 at 2:15 p. m."

7. *Male & Female* is classified as an anthology of literature under the Library of Congress Classification System, and under the Dewey Decimal system.

next day in his newspaper, *The Chelsea Record*, in which he commented:

I think it can be said without contradiction that I am certainly no prude in certain matters—but the complaint of a father made to me yesterday about passages in a book his daughter obtained at the high school library has almost made me sick to my stomach to think that such a book could be obtained in any school—let alone one here in Chelsea.

I want to bring this matter to the attention of our Administrators and I want to make certain that no such filth will be distributed in our schools.

Quite frankly, more than that, I want a complete review of how it was possible for such garbage to even get on bookshelves where 14 year old high school—ninth graders—could obtain them.[8]

Superintendent McGee first became aware of a controversy concerning *Male & Female* when he read Quigley's article in the May 20 *Chelsea Record*. Because Quigley was out of town over the weekend, McGee did not obtain the book from him until 2:00 P.M. on Monday, May 23rd.

On May 23rd, Quigley distributed copies of *City* prior to the Committee meeting to each of its other three male members. He did not give a copy to any of the three women members, because of the poem's "crude" and "offensive" language. Quigley assumed that at least two of the women members, Moore and Montesano, would accept his characterization of the poem and, therefore, would agree to conduct an inquiry as to how the book got into the library.

At the May 23rd meeting, Quigley characterized the poem as "objectionable" and "outright obscene." He commented that it was "a serious mistake" to allow "this filth on the library shelves," and that he wanted to "make certain it doesn't happen again." Defendant Tiro concurred saying, "the book is lewd and leaves nothing to the imagination. It's outright obnoxious." Quigley then moved that the Superintendent be re-

quested to report to the Committee as to how books, *Male & Female* in particular, were selected for the High School Library. Defendant Morochnick unsuccessfully sought to amend Quigley's motion by suggesting that, after the receipt of the Superintendent's report, the Committee meet in executive session with the librarian, the headmaster and complaining parent. McGee stated that it was inappropriate to handle this complaint in an open school meeting, and that Quigley was "setting in motion a chain of events that might lead to censorship."

In the May 25, 1978 *Chelsea Record*, Quigley chastized McGee in an editorial entitled "Mr. McGee's Censorship." That editorial characterized *City* as "obviously obscene," "filthy" and "vile and offensive garbage."

Quigley called another special meeting of the Committee for May 26, 1977, to confer with the complaining parent. At this meeting, McGee submitted a report based on his reading of the entire book. He identified *City* as its "objectionable portion." He stated that, other than the poem *City* and an objectionable word which appeared in another poem, there was no "obscene terminology" in the book. McGee's conclusion was that,

the text reflects the goals the editors were attempting to accomplish. I believe the book is sound and has educational value with the exception of the passage objected to and one other word in one other poem.

McGee reported that the book would be removed from the library until a decision was made as to whether to keep the entire book off the shelf or only to remove the offending pages. The book was then turned over to the principal, Franco, who had also submitted a report on High School Library procedures. Franco's report included an explanation by Coleman of the library selection process, as well as her description of a procedure recommended by the Ameri-

---

**8.** Quigley acknowledged authorship of *The Chelsea Record* editorials discussed in this opinion, as well as the accuracy of statements attributed to him in that paper.

can Library Association for considering challenges to the suitability of library material. Quigley requested McGee to determine if Coleman had knowingly put "trash" in the library. The Committee would then determine whether she was "the type of person we want to continue in that position."

On June 14, 1977, Coleman published a statement in *The Chelsea Record* in which she opined that *City* was not obscene, that both students and faculty should have access to it, and that the book should not have been removed from the library without the type of hearing recommended by the American Library Association. In response, Quigley was quoted in his newspaper as being

> shocked and extremely disappointed to have our high school librarian claim there is nothing lewd, lascivious, filthy, suggestive, licentious, pornographic or obscene about this particular poem in this book of many poems.

A special committee meeting with Coleman was called for July 20, 1977, for the purpose of determining how a book such as *Male & Female* could have been placed in the High School Library. At this meeting, Coleman defended the work and its use by students and faculty. Quigley's assessment, however, was that *City* was "low down dirty rotten filth, garbage, fit only for the sewer." Although not a lawyer, Quigley mentioned the case of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and observed that, under local community standards in Chelsea, *City* was obscene. Defendant Moore classified the work as a "dirty, filthy, rotten poem," written by "a sick child." Defendant Tiro agreed with Quigley that, under *Miller,* the Committee could apply local community standards and that he would vote to ban the book. Defendant Kornechuk was interested in determining whether Coleman knew that the poem was in the book.

The next special meeting of the Committee was called by Quigley for July 28, 1977. The stated purpose was for "considering and voting upon motions pertaining to the book entitled *Male & Female Under 18* at the high school." Quigley moved that the action of the Superintendent in removing and not returning *Male & Female* be affirmed by the Committee. Morochnick offered an amendment that the book remain in the library but be circulated to students under 18 only if they had written permission from their parents. The amendment was defeated 6–1, with only Morochnick voting in favor of it. Quigley's motion was adopted 6–0, with Morochnick abstaining.[9]

The regular July 28, 1977 School Committee meeting was convened immediately following the special meeting at which the aforementioned vote was taken on *Male & Female.* Quigley moved that consideration be given to transferring Coleman from the library to a classroom because of her "mistake" in having selected *Male & Female* for the library. Tiro moved that Coleman be transferred immediately because she was "out of the mainstream of contact with the youngsters in a classroom situation." Moore moved to table the motions so that Coleman could "think things over." She also moved that a committee be formed for the "careful selection of books from 'good standard lists' for use in the libraries of the Chelsea School System." Quigley moved that the matter be referred to McGee for a feasibility study. Morochnick moved that McGee also study the feasibility of "setting up a system of reviewing and acting upon complaints from parents or others on any books." The Morochnick amendment was defeated and the motion as amended by Quigley was passed.

McGee later informed Franco that the page containing *City* was to be removed from *Male & Female.* Franco removed the page, but kept the book in his office. It does not appear that the Committee members had read any of *Male & Female,* other

9. In a *Chelsea Record* editorial the next day, July 29th, Quigley characterized Morochnick's abstention as a "vote without conscience."

than *City,* prior to voting to ban the entire anthology.

On August 3, 1977, this lawsuit was filed. When Quigley learned of the suit he was quoted as follows in his newspaper, *The Chelsea Record* :

Who needs employees like that? Who needs employees that will fight to keep the kind of tasteless, filthy trash that is contained in the poem we voted to remove? I may even call a special meeting to discuss what we'll do with these insubordinate teachers.

In a *Chelsea Record* editorial on August 4, 1977, Quigley observed that the Committee "may seek to reassign the School Librarian; or . . . seek the resignations of those teachers who have taken the legal action to restore the poem to the High School Library," and that "it may be necessary to institute a petition to let the people know just what the 'community standards' do NOT include accepting the 'filth' of that poem."

Quigley circulated such petitions for the purpose of demonstrating to this court that *City* was not acceptable under Chelsea's local community standards. A Quigley editorial entitled " 'Obscene' Poem Petition" appeared in the August 5th *Chelsea Record.*

These next few days could be very important to the people of Chelsea who feel this poem is in fact "filthy" or "obscene" or to give it the benefit of every doubt it is certainly in 'bad taste.'

And we submit it is not the type of poem that the overwhelming majority of parents—AND STUDENTS—want on any library shelf.

We therefore will be printing petitions which we hope hundreds and hundreds of Chelsea people will sign so that the Judge hearing this case can get some idea of just what 'community standards' are in the City of Chelsea.

At a special meeting of the School Committee on August 10, 1977, its attorney, Robert Tatel, recommended a newspaper survey be conducted to determine communi-

ty standards, and that a citizens' conference be conveyed for the same purpose. Implementing counsel's suggestion, the Committee sent letters, enclosing copies of the poem, to thirty Chelsea clergy soliciting their evaluation of *City.* Two clergy responded. Both supported the Committee's position.

Another special meeting was held on August 17, 1977 at which Tatel presented the Committee with two resolutions for adoption. The first reaffirmed its decision to remove *Male & Female* from the library on the grounds that 1) the book dealt with "sex education," not a school subject; 2) that *City* had a potentially unhealthy and counter-productive effect on some children; and 3) the Committee preferred that even sex education books in the library not contain words and phrases considered "filthy, shocking and obscene by a large section of the community." The second resolution insulated Coleman, the faculty and student body from any sanctions arising out of the *Male & Female* incident.

This was the first occasion on which counsel had ever presented the Committee with fully prepared resolutions for its adoption. They were prepared for submission to this court at a hearing scheduled the next day, August 18, 1977.[10]

After that hearing, this court issued its temporary restraining order. *See* n. 6, *supra.*

On August 29, 1977, an article entitled "Parent of Chelsea Student Complaints to Superintendent McGee About Sections In Book" appeared in *The Chelsea Record.* Prior to its publication, Quigley had received a complaint from a parent of a high school student about a book entitled *Growing Up Puerto Rican* that had been used in the Adolescent Literature course taught by plaintiff Bartlett.

In an editorial appearing the same day entitled "More 'Filthy' Books . . . ", Quigley said that Bartlett's use of that book in her class was "an absolute outrage" and

**10.** This court finds the adoption of these resolutions to have been a tactical subterfuge by the Committee and counsel. See further discussion on this point in Section III *infra.*

that this federal court case "must not and cannot be allowed to intimidate the Committee from doing what has to be done to root out all the 'filthy' literature that is being circulated in the High School under the guise of 'education.'" The editorial concluded that "[s]uch instances of this type of 'filth' MUST NOT—CANNOT—AND WILL NOT be permitted in Chelsea Schools."

## II.

The School Committee defends against this suit by claiming an unconstrained authority to remove books from the shelves of the school library. This authority is said to derive from various state statutes giving it "general charge" of the public schools within its jurisdiction, and directing it to purchase textbooks and other supplies for the schools.[11] The Committee argues further that it was not required to purchase *Male & Female* for the library and, therefore, could remove it at will. This court disagrees, and determines that, under the circumstances of this case, the defendants' removal of *Male & Female* from the library was an infringement of the First Amendment rights of the students and faculty of Chelsea High School.

## III.

■ The Supreme Court has commented that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). The fundamental notion underlying the First Amendment is that citizens, free to speak and hear, will be able to form judgments concerning matters affecting their lives, independent of any governmental sua-

sion or propaganda. Consistent with that noble purpose, a school should be a readily accessible warehouse of ideas.

The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'

*Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), *quoting United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943).

■ Recognizing the important interplay between First Amendment goals and the function of our schools, courts have occasionally found it necessary to intervene in the administration of school affairs. It has been declared unconstitutional for a state to forbid instruction, other than in the English language, to students below the eighth grade, *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and to prohibit the teaching of evolution in public schools, *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Students have the right to express themselves in non-disruptive political protest, *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and the right not to be forced to express ideas with which they disagree, *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). In short, the First Amendment is not merely a mantle which students and faculty must doff when they take their places in the classroom.[12]

■ It is clear despite such intervention, however, that local authorities are, and must continue to be, the principal policy

---

11. Mass.Gen.Laws ch. 71, § 37 and Mass.Gen. Laws ch. 71, § 48.

12. The First Circuit has recognized the responsibility of courts to intervene in school policy in order to vindicate constitutional liberties. In connection with the school desegregation process, it reminded the Boston School Committee that "its duties 'must be exercised consistently with federal constitutional requirements.'"

*Morgan v. McDonough,* 548 F.2d 28, 32 (1st Cir. 1977). In a case involving the discipline of a teacher for use of a vulgarity in class, the First Circuit noted that it would have to superimpose its judgment on school authorities if, in a constitutional area, their decision was "plainly wrong." *Mailloux v. Kiley,* 436 F.2d 565, 566 (1st Cir. 1971).

makers in the public schools. School committees require a flexible and comprehensive set of powers to discharge the challenging tasks that confront them. As the Court stated in *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968):

> By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.

It is the tension between these necessary administrative powers and the First Amendment rights of those within the school system that underlies the conflict in this case. Clearly, a school committee can determine what books will go into a library and, indeed, if there will be a library at all. But the question presented here is whether a school committee has the same degree of discretion to order a book removed from a library.

Two federal courts of appeal addressed this issue in cases involving factual patterns similar to that involved here. In *Presidents Council District 25 v. Community School Board No. 25,* 457 F.2d 289 (2d Cir.), *cert. denied,* 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), the Second Circuit upheld a school board's removal of the book *Down These Mean Streets* from a high school library. In contrast, the school board's removal of a Kurt Vonnegut novel from a school library was set aside by the Sixth Circuit in the case of *Minarcini v. Strongsville City School District,* 541 F.2d 577 (1976).

Defendants' heavy reliance on *Presidents Council* presumes incorrectly that the holding there would afford a school committee the absolute right to remove a disfavored book from a library, without any concern for the First Amendment rights of students and faculty. Such reliance overlooks the Second Circuit's implicit acknowledgment that, however absolute may be a school board's discretion in selecting books, there are boundaries to its authority to remove a book from a library.

> It would seem clear to us that books which become obsolete or irrelevant or where improperly selected initially, for whatever reason, can be removed by the same authority which was empowered to make the selection in the first place.

457 F.2d at 293.[13]

Here, there is no evidence that the challenged anthology is obsolete. Indeed, there was ample evidence to support the plaintiffs' assertion that the work is relevant to a number of courses taught at Chelsea High School. No contention has been made that the book was improperly selected, insofar as Chelsea procurement regulations were concerned. Despite their continuing objection to the language employed, defendants do not now contend the work is obscene. Limitations of resources such as money and shelf space are not factors here. The book has already been purchased and paid for. It is a small paperback approximately one inch thick. There has been no suggestion that its presence in the library has contributed to any shelf space problem.

The record leaves this court with no doubt that the reason the Committee banned *Male & Female* was because it considered the theme and language of *City* to be offensive. At the time the book was removed, and during their testimony at trial, the members consistently expressed their opinion that *City* was "filthy," "obscene," "disgusting." A number also objected to its theme, as they interpreted it.

Defendants contend that the Committee's reasons for banning *Male & Female* were formulated on the date of removal and were memorialized by a formal resolution

---

**13.** The Sixth Circuit in *Minarcini* reached a similar conclusion in its analysis of *Presidents Council,* rejecting any contention that the Second Circuit had upheld an absolute right on the part of a school board to remove books from a library. 541 F.2d at 581.

of the Committee dated August 17, 1977 (Section I, *supra* ). This resolution recited reasons in addition to the poem's language and theme for its removal. This court finds, however, that the August 17 resolution of the Committee was a self-serving document that rewrote history in an effort to meet the issues of this litigation. In simple terms, it was a pretext.[14]

■ Of course, not every removal of a book from a school library implicates First Amendment values. But when, as here, a book is removed because its theme and language are offensive to a school committee, those aggrieved are entitled to seek court intervention. The Supreme Court has recently acknowledged that the reasons underlying the actions of school officials may determine their constitutionality. In *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), an untenured teacher claimed that his contract was not renewed in violation of his First Amendment rights. The Court remanded for further review, commenting:

Doyle's claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him . . . he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.

429 U.S. at 283–4, 97 S.Ct. at 574.

■ The Committee was under no obligation to purchase *Male & Female* for the High School Library, but it did. It is a familiar constitutional principle that a state, though having acted when not compelled, may consequentially create a constitutionally protected interest.[15]

In *Minarcini,* the court commented,

Neither the State of Ohio nor the Strongsville School Board was under any federal constitutional compulsion to provide a library for the Strongsville High School to choose any particular books. Once having created such a privilege for

14. In disregarding that resolution as pretextual, this court is following the analytical principles of *Tardif v. Quinn,* 545 F.2d 761 (1st Cir. 1976). There, plaintiff alleged she had been fired from her teaching position for wearing short skirts. Defendants responded that she was discharged for failing to meet outside course requirements, but the Court of Appeals commented:

> [I]n the light of [the contract rationale's] late appearance, coupled with defendants' total failure to support other reasons given, causes us to believe, following familiar principles in Labor Board cases, that it should be disregarded as 'pretextual'.

545 F.2d at 762 (footnote omitted). *Accord, Mabey v. Reagan,* 537 F.2d 1036 (9th Cir. 1976).

15. *See, e. g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Escalera v. New York City Housing Authority,* 425 F.2d 853 (2d Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); *Brooks v. Auburn University,* 412 F.2d 1171 (5th Cir. 1969).

The First Circuit's decision in *Advocates for the Arts v. Thomson,* 532 F.2d 792 (1st Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976), is not to the contrary.

There, the court rejected plaintiffs' claim that the state's decision to stop funding their literary magazine because of offensive language contained in one of the published poems violated plaintiffs' First Amendment rights. The court noted that the state committee's selection of grantees worthy of support did not constitute suppression of speech:

> [P]ublic funding of the arts seeks 'not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge' artistic expression. . . . A disappointed grant applicant cannot complain that his work has been suppressed, but only that another's has been promoted in its stead.

532 F.2d at 795 (*citing Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Nor does *Close v. Lederle,* 424 F.2d 988 (1st Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970), further defendants' contentions. There, the First Circuit upheld the removal of a professor's sexually explicit art works from the corridor of a state university building prior to the expiration of the time allotted the exhibit. Significant to the court's holding, however, was the finding that the students were a "captive audience." 424 F.2d 988 at 990.

the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members.

541 F.2d at 582 (footnote omitted).[16]

In *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), three junior high school students were suspended for wearing black armbands to school to protest the Vietnam War. The Court found the action unconstitutional, and commented:

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. *Burnside v. Byars, supra,* at 749.

393 U.S. at 509, 89 S.Ct. at 738.

■ *Tinker* points the way to the applicable standard to be applied here. When First Amendment values are implicated, the local officials removing the book must demonstrate some substantial and legitimate government interest. *Tinker* does not require the Committee to demonstrate that the book's presence in the library was a threat to school discipline, but it does stand for the proposition that an interest compa-

rable to school discipline must be at stake. *See also Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

■ No substantial governmental interest was served by cutting off students' access to *Male & Female* in the library. The defendants acted because they felt *City's* language and theme might have a damaging impact on the High School students. But the great weight of expert testimony presented at trial left a clear picture that *City* is a work of at least some value that would have no harmful effect on the students. Defendants' case was premised on the assumption that language offensive to the Committee and some parents had no place in the Chelsea educational system. In *Keefe v. Geanakos,* 418 F.2d 359, 361–62, Judge Aldrich met a comparable contention handily.

With the greatest of respect to such parents, their sensibilities are not the full measure of what is proper education.

In *Keefe,* the First Circuit granted a temporary injunction to a teacher threatened with discipline for assigning an article containing vulgarities to an English class of high school seniors, and discussing one of the vulgar words with them. Finding that the teacher had a probability of success on the merits, the court commented:

Hence the question in this case is whether a teacher may, for demonstrated educational purposes, quote a 'dirty' word currently used in order to give special offense, or whether the shock is too great for high school seniors to stand. If the answer were that the students must be

16. A thoughtful comment on *Minarcini* observes:

Selection of books to be shelved . . . requires choosing from an infinite variety of books since no public high school facility has the cataloguing staff, the space, or the budget to carry more than a fraction of published works that might be mentioned in class. Employing content as one of many criteria in textbook selection is different from adopting content as the sole basis for excising a particular book. The countervailing government interests—scarce funds, limited personnel, and restricted space—that outweigh the constitutional interests of students in a book selection situation disappear when school officials remove a particular book merely because its content is offensive to their personal tastes.

Note, *Student's Right to Receive Information Precludes Board's Removal of Allegedly Offensive Books from High School Library,* 30 Vand. L.Rev. 85, 98 (1977).

protected from such exposure, we would fear for their future.

418 F.2d at 361.[17]

■ *City* is not a polite poem. Its language is tough, but not obscene. Whether or not scholarly, the poem is challenging and thought-provoking. It employs vivid street language, legitimately offensive to some, but certainly not to everyone. The author is writing about her perception of city life in rough but relevant language that gives credibility to the development of a sensitive theme. *City's* words may shock, but they communicate. As the Supreme Court has noted,

> [W]ords are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.

*Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).

■ The Committee claims an absolute right to remove *City* from the shelves of the school library. It has no such right, and compelling policy considerations argue against any public authority having such an unreviewable power of censorship. There is more at issue here than the poem *City*. If this work may be removed by a committee hostile to its language and theme, then the precedent is set for removal of any other work. The prospect of successive school committees "sanitizing" the school library of views divergent from their own is alarming, whether they do it book by book or one page at a time.[18]

■ What is at stake here is the right to read and be exposed to controversial thoughts and language—a valuable right subject to First Amendment protection. As the Court commented in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386–390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969):

> It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here.

The Court has underscored the importance of that principle to our nation's schools:

> In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the

---

17. In *Papish v. Missouri Curators,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), a college student was expelled for distributing a newspaper with vulgar words on a university campus. The Court held that it is "clear that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.' " 410 U.S. at 670, 93 S.Ct. at 1199. Some of the Chelsea students are younger than those students affected in *Keefe* and *Papish,* but defendants produced no credible evidence that the age difference was consequential.

> A commentator has noted:
> It is true that *Lamont* and the cases on controversial campus speakers involve adults or college students who are generally more mature than high school students. Moreover, a high school classroom would seem to be a more controlled and restricted marketplace of ideas than the mail or college campuses, if only because of compulsory attendance and, frequently, a uniformly required curriculum.

> Nevertheless . . . it is clear that students cannot be insulated from controversial subjects in school. If this applies to student expression through worn symbols [and] underground newspapers . . . then it would seem both inconsistent and educationally unworkable to prohibit student access to controversial subjects through supervised classroom presentations.

> Nahmod, *Controversy in the Classroom: The High School Teacher and Freedom of Expression,* 39 Geo.Wash.L.Rev. 1032, 1055 (1971).

18. Defendants' suggestion that *Male & Female* may be returned to the library shelf upon excision of *City* serves to underscore rather than solve the problem here. An anthology is a collection of selected literary works. It would be no less offensive to First Amendment principles for a School Committee to bowdlerize an anthology by removing one poem, than it would be for it to excise objectionable passages in a novel.

expression of those sentiments that are officially approved.

*Tinker v. Des Moines School District, supra,* 393 U.S. at 511, 89 S.Ct. at 739.[19]

CONCLUSION

The library is "a mighty resource in the marketplace of ideas." *Minarcini v. Strongsville City School District, supra* at 582. There a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment. That student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom.

The most effective antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control. The Committee's ban of the anthology *Male & Female* is enjoined.[20]

An order will issue.

---

**19.** Plaintiffs contend that defendants' ban deprived them of their access to *Male & Female* in the High School Library. Defendants counter that:

> The plaintiffs did not prove that a single living person has ever exhibited an interest in reading this material and has been prevented from doing so by the actions of the Chelsea School Committee.
> If one wanted to own a personal copy of the book, it is available for $1.50 from the publisher. There was no evidence that students at the Chelsea High School could or would be inhibited by this price from purchasing any book they had any serious desire to read.

Defendants' Post-Trial Memorandum at 2.

Defendants' contention is without merit. At least since 1939 it has been settled that "[o]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other

place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). *See also Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Spence v. Washington,* 418 U.S. 405, 411, n. 4, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Minarcini v. Strongsville City School Dist.,* 541 F.2d 577 (6th Cir. 1976).

**20.** In a recent opinion, *F.C.C. v. Pacifica Foundation,* No. 77-528 (July 3, 1978), the Supreme Court approved a decision by the F.C.C. proscribing the broadcast of several words, some of which coincidentally are contained in *City.* That decision, however, is inapposite to the issues here. In *Pacifica,* the Court sustained the F.C.C. action primarily on the ground that broadcasts have the unique potential for invading the privacy of the home. Here we are dealing with a library setting where there is no comparable danger of invasion. The fundamental issue here is whether there should be the opportunity for selection.