Rhonda SALVAIL, Individually and as representative of class of all students at Nashua High School, William Hodge, Individually and as representative of class of all teachers at Nashua High School, David E. Cote, Individually and as representative of all graduates of class of 1978 at Nashua High School, Suzanne Coletta and Albert Burrelle, Individually and as representative of teacher/parents, parents and citizens concerned with education at Nashua High School

v.

NASHUA BOARD OF EDUCATION, Dr. Paul Ouellette, Chairman, Alan Thomaier, Frank Ulcickas, Thomas Stylianos, Carolyn Mason, T. Harrison Whalen, Judith Berman, Anthony Mirandos, Marlo Sheer, members of the Nashua Board of Education, and Berard Masse, Superintendent of Nashua High School.

Civ. No. 78–401.

United States District Court,
D. New Hampshire.

May 7, 1979.

**1270**

Stephen E. Borofsky, Nashua, N. H., N. H. Civil Liberties Union, Concord, N. H., for plaintiffs.

Eugene M. Van Loan, III, Manchester, N. H., H. Philip Howorth, Nashua, N. H., for defendants.

## ORDER AND OPINION

DEVINE, District Judge.

The issue before the Court concerns the extent of the authority of the Nashua School Board to remove certain periodicals from the senior high school library. This issue is apparently one of current national interest.[1]

Plaintiff Rhonda Salvail is a sixteen-year-old eleventh grade student at Nashua High School; plaintiff William Hodge teaches English at said high school; plaintiffs Suzanne Coletta and Albert Burrelle are adult residents and taxpayers in Nashua; and plaintiff David E. Cote is a 1978 graduate of Nashua High School who was present when the incidents which give rise to this litigation occurred. Defendants are the Nashua Board of Education ("Board"); Board members Dr. Paul Ouellette, Alan Thomaier, Frank Ulcickas, Thomas Stylianos, Carolyn Mason, T. Harrison Whalen, Judith Berman, Anthony Mirandos, Marlo Sheer, together with Berard Masse, School Superintendent.

The plaintiffs claim deprivation of due process and rights under the First Amendment, and bring this action under 42 U.S.C. § 1983, invoking jurisdiction pursuant to 28 U.S.C. §§ 1343 and 2201. The matter came before the Court, which held a hearing on the merits pursuant to the provisions of Rule 65(a)(2), Federal Rules of Civil Procedure. The Court has reviewed the testimony at such hearing, together with the exhibits, pleadings, legal memos, and other documents on file.

### THE FACTS

In March of 1977, the New Hampshire State Department of Education forwarded to each of the 186 school districts certain guidelines for the selection of instructional materials and for review of any challenges to same (Defendants' Exhibit B). Reginald Comeau, consultant of the Libraries and Learning Resources Program of the State

---

1. See: "Censorship of Textbooks Is Found On Rise in Schools Around Nation", p. B15, New York Times, March 27, 1979.

Department of Education, testified that although these guidelines were advisory in nature, they were designed to be applicable to challenges to the material made by the members of any school board.

The Nashua Board of Education is composed of nine members elected at large by the voters of that city. *Sullivan v. Flynn,* 116 N.H. 547, 551, 365 A.2d 1052, 1055 (1976). The duties of school boards in New Hampshire include the purchase of textbooks and other supplies required for use in the public schools. RSA 189:16.[2]

Upon receipt of the suggested guidelines from the State Department of Education, the Nashua Board established a committee which in turn drafted certain interim "Guidelines For Selecting Instructional Materials" (Plaintiffs' Exhibit 4), which interim guidelines were in effect at the time of the incidents which gave rise to this litigation. These guidelines provided a method for selection of materials whereby the Board conceded its legal responsibility for all matters relating to the operation of the Nashua schools, but delegated the selection of instructional materials to the "professionally trained personnel employed by the school district." (Plaintiffs' Exhibit 4, p. 2.) It was required by the guidelines that the materials be consistent with the general educational goals of the school district, meet high standards of quality in factual content and presentation, be appropriate for the subject area and for the age, maturation, ability level, and social development of the students, have aesthetic, literary, or social value, be designed to help the students gain an awareness and understanding of the contributions made by both sexes, and by religious, ethnic and cultural groups to American heritage; and that a selection of materials on controversial issues be directed toward maintaining a balanced collection representing various views. (Plaintiffs' Exhibit 4, pp. 1, 2.)

In the event a member of the public raised a question or complaint, the guidelines provided for the appointment of an Instructional Materials Reconsideration Committee composed of professional library-media personnel, the principal or his representative, the appropriate assistant superintendent, the person or persons involved in the original selection of the material, and the person or persons using the materials in the individual school. (Plaintiffs' Exhibit 4, p. 4.) This committee was required to reexamine the material and furnish a report to the superintendent who in turn was to forward copies of same to the complainant. (Plaintiffs' Exhibit 4, p. 4.) The complaining party was granted a right to appeal the decision of the Reconsideration Committee to the superintendent and, if not satisfied with his decision, to refer the decision to the Board. (Plaintiffs' Exhibit 4, p. 4.)

Board member Thomaier held strong religious and patriotic views as to the types of reading material that should be available to pupils in a senior high school. In late 1977 and early 1978, he expressed concern about MS magazine, which was carried in the school library and was available upon request to students in the senior high school. At a meeting of the Board on March 13, 1978, he presented a formal resolution to withdraw the magazine from the school library (Plaintiffs' Exhibit 2, Resolution of Alan C. Thomaier) appending thereto photocopies of classified advertisement sections from one of the issues of the magazine (Plaintiffs' Exhibit 5). At the meeting of the Board on March 27, 1978, Thomaier moved, seconded by member Stylianos, to have this resolution voted upon. Board members Sheer, Berman, and Chairman Ouellette suggested that the interim guidelines should be followed, and the procedure for review was explained by Superintendent Masse. Stylianos took the position that the Board members were not bound by these interim guidelines and that "in some cases they should act instantaneously"

2. RSA 189:16 provides that school boards "shall purchase, at the expense of the city or town in which the district is situated, textbooks and other supplies required for use in the public schools; and shall loan same to the pupils of such schools free of charge, subject to such regulations for their care and custody as the board may prescribe; and shall sell such books at cost to pupils of the school wishing to purchase them for their own use."

(Plaintiffs' Exhibit 2). By a five to three vote, the motion carried, and subsequently the subscription to MS magazine was canceled and all issues were removed from the school library (Plaintiffs' Exhibit 10).

Thomaier's objection to the periodical focused largely on the fact that it contained advertisements for "vibrators", contraceptives, materials dealing with lesbianism and witchcraft, and gay material. He also objected to advertisements for what he described as a pro-communist newspaper ("The Guardian") and advertisements suggesting trips to Cuba. In addition he felt that the magazine encouraged students and teachers to send away for records made by known communist folk singers. Board member Stylianos, a former school teacher and principal, took the position that the proper test for material to be available for reading by high school students was whether it could be read aloud to his daughter in a classroom.

Plaintiff Salvail testified that she found MS of value in her assigned high school courses, as it discussed important social issues from a feminist viewpoint. She further testified that sexual matters were openly discussed at the Nashua senior high school and that she worked afternoons in a store where vibrators were sold. Ann Hostage, an English teacher, testified that she had assigned research in the magazine to several of her pupils, and plaintiff Hodge, another English teacher, said that he often assigned writings to his students on topics to be chosen by them and that his students had found the magazine valuable as a research tool.

Joseph Dionne, holder of a Master's degree in Library Science, himself a former assistant librarian at Nashua Public Library, testified that he had reviewed the issues of MS for the months of October 1977 through April 1978. He testified flatly that the magazine was neither obscene, patently offensive, nor in contravention of community standards, and that he felt that it was of value as a research tool. He also produced evidence that the magazine is indexed in the traditional type of reference volumes available to librarians for selection of books and periodicals. (Plaintiffs' Exhibits 7, 8.)

Joan McNamara, coordinator of instructional materials for the Concord senior high school, also possessed of a Master's degree in Library Science, testified that her high school has used MS magazine since 1975, that it is not obscene, that it is not patently offensive, that it does not contravene community standards, and that it has a substantial degree of use by students at Concord High School. Board members Ouellette, Sheer, and Berman who had cast dissenting votes at the March 27, 1978, meeting, testified that they had done so because they felt that the Board should have followed the interim guidelines.

At a meeting of the Board on April 10, 1978, which was largely attended by the public, a number of letters (including one from member Carolyn Mason who had been unable to attend the meeting on March 27) from teachers and others were introduced relative to the failure to follow the review procedure with respect to MS magazine. In addition, a number of people spoke both pro and con relative to the action of the Board.

Subsequent to the commencement of the litigation herein, the Board met on March 27, 1979, having reviewed and scrutinized the issues of MS which had been removed from the library. At the meeting they voted to return the December 1977 and January 1978 issues of the magazine with classified ads excised. The Board also approved at such meeting final revised guidelines for the selection of instructional material which, as worded, were clearly applicable to (any Nashua resident) and would therefore include any member of the Board (Defendants' Exhibit C).

## THE LAW

It is, of course, clear that the Board is required neither to provide a library for the Nashua senior high school nor to choose any particular books therefor, but, once having created such a privilege for the benefits of its students, it could not place conditions on the use of the library related solely to the social or political tastes of Board members. *Minarcini v. Strongsville City School District*, 541 F.2d 577, 582 (6th

Cir. 1976). The duties of school boards must be exercised "consistently with federal constitutional requirements". *Morgan v. McDonough*, 548 F.2d 28, 32 (1st Cir. 1977). It is a familiar constitutional principle that a state, having so acted when not compelled, may consequentially create a constitutionally protected interest. *Right to Read Defense Committee v. School Committee*, 454 F.Supp. 703, 712 (D.Mass.1978).

■ The Court has reviewed the October 1977, November 1977, December 1977, January 1978, February 1978, March 1978, April 1978, and September 1978 issues of MS magazine (Defendants' Exhibit A; Plaintiffs' Exhibits 9A, 9B, 9C, 9D, 9E, 9F, 9G), and finds that although there are certain articles and works of fiction therein which would be offensive to some, that the periodicals do contain material which would be of interest to someone researching the current feminist viewpoint on matters of social interest, and that the materials themselves are not obscene within any recognized legal definition.

■ The evidence presented to the Court makes it clear that these magazines "taken as a whole" *do not lack* "serious literary, artistic, political, or scientific value". *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). The First Amendment generally prohibits governments from "cleans[ing] public debate to the point where it is grammatically palatable to the most squeamish among us." *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). "[I]t is . . . often true that one man's vulgarity is another's lyric." *Id.*[3] Defendants argue that the Board correctly decided that the "interim guidelines" were not applicable to it, stressing that New Hampshire law makes clear that interpretation by an administrative body of its own rules will be honored by a reviewing court unless the interpretation is patently unreasonable. The cases cited in support of this contention (*Bellows Falls, etc., Co. v. State*, 94 N.H. 187, 49 A.2d 511 [1946]; *New Hampshire Retail Grocers Association v. State Tax Commission*, 113 N.H. 511, 309 A.2d 890 [1973]; *Farrelly v. Timberlane Regional School District*, 114 N.H. 560, 324 A.2d 723 [1974]) so hold, but they are inapplicable in the context of the instant case. In cases of constitutional interpretation, the customary deference to an agency's interpretation of its own regulations is inappropriate. *Pacifica Foundation v. FCC*, 181 U.S.App.D.C. 132, 145, n. 12, 556 F.2d 9, 22, n. 12 (1977—concurring opinion of Bazelon, C. J.); *National Broadcasting Co., Inc. v. FCC*, 170 U.S.App.D.C. 173, 516 F.2d 1101 (1974). In the instant case it is clear that Board members Ouellette, Sheer, and Berman, together with Superintendent Masse and Reginald Comeau, were all of the opinion that the "interim guidelines" were applicable to the Nashua School Board. The Court finds and rules that, having adopted such "interim guidelines", the Board was required to follow them in its attempts at removal of MS magazine from the shelves of the high school library. *McDonald v. NCAA*, 370 F.Supp. 625 (C.D.Cal.1974); *Behagen v. Intercollegiate Conference of Faculty Representatives*, 346 F.Supp. 602 (D.Minn.1972).

Defendants' reliance on *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2d Cir.), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), is misplaced. In the course of its opinion, that court said:

> [t]o suggest that the shelving or unshelving of books presents a constitutional issue, *particularly where there is no showing of a curtailment of freedom of speech or thought,* is a proposition we cannot accept.

---

**3.** Constitutional protection has accordingly been afforded to such items as displays of nudity on drive-in movie screens (*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 [1975]); utterance of a vulgar epithet (*Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 [1974]); utterance of a vulgar remark (*Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 [1973]); indecent remarks in a campus newspaper (*Papish v. University of Missouri Curators*, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 [1973]); utterance of racial slurs (*Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 [1969]); and an alluring portrayal of adultery as proper behavior (*Kingsley Pictures Corp. v. Regents*, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 [1959]).

*Id.*, at 293 (emphasis supplied) (footnote omitted). A fair reading of the language above emphasized makes clear that *Presidents Council* does not stand for an absolute right on the part of a school board to remove from the library any books it regarded unfavorably without concern for the First Amendment. *Minarcini, supra*, at 581.

Furthermore, *Presidents Council* was decided prior to *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), where in striking down a statute which declared unprofessional conduct for a licensed pharmacist to advertise the price of prescription drugs, the court stated in pertinent part:

> Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases. . . .

*Id.*, at 756, 96 S.Ct. at 1823.

And in a recent note discussing the implications of the effect of *Virginia Pharmacy* on *Presidents Council*, it has been stated:

> Clearly the library of a public high school is a 'forum for silent speech' with communication evidenced by the presence of a source (books) and a recipient (student-reader). Since such communications are protected by the first amendment, any justification offered for denying student access to particular books must meet constitutional standards. Thus, in justifying restrictions on students' right to receive information, school authorities must bear the burden of showing a substantial government interest to be served by the restriction. Admittedly, the burden is less stringent than when such restrictions arise in a truly public form, since students' first amendment rights must be limited to some extent due to the special administrative needs of the school environment. Nevertheless, the decision to remove a book from library use should be based upon 'educational' considerations, obsolescence, or architectural necessity. Such objective criteria would minimize the danger that book removal will be based upon constitutionally impermissible grounds, such as the political and social tastes of board members.

Note, *First Amendment Limitations on the Power of School Boards to Select and Remove High School Text and Library Books*, 52 St. John's L.R., 457, at 471 (1978).

■ Ironically, the dislike of certain of the Board members for articles and advertisements contained in MS magazine apparently does not extend to similar materials in other publications which are contained in the Nashua High School library.[4] The Court finds that despite protestations contained in the testimony of these parties, it is the "political" content of MS magazine more than its sexual overtones that led to its arbitrary displacement. Such a basis for removal of the publication is constitutionally impermissible.

The reliance of defendants on the recent decision of *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) is likewise misplaced. That case is inapposite to the issues here presented.

> In *Pacifica*, the Court sustained the F.C.C. action primarily on the ground that broadcasts have the unique potential for invading the privacy of the home. Here we are dealing with a library setting, where there is no comparable danger of invasion. The fundamental issue here is whether there should be the opportunity for selection.

*Right to Read Defense Committee v. School Committee, supra*, at 715, n. 20.

---

4. Examples of this are found in Plaintiffs' Exhibit 12A (Redbook, Jan. 1979), which contains an article entitled, *Your Sexuality—Questions About The Diaphragm; Pills And Weight Gain* (p. 43), and advertisements for "early pregnancy tests" (p. 53), contraceptives (p. 143), and bust developers (p. 145). Plaintiffs' Exhibit 12B (Mademoiselle, Jan. 1979) contains an article entitled, *Sex: Is It Finally Time to Shut Up About It?* (p. 88), and advertisements for bust developers (pp. 131, 141) and an "illustrated encyclopedia" of sexual anatomy and function (p. 142). Plaintiffs' Exhibit 12C (Family Health, Jan. 1979) contains advertisements for early pregnancy tests (p. 5), for contraceptives and vibrators (p. 56), and for a book entitled, *Conception: A Matter of Timing* (p. 55).

The court also finds that the actions of the Board taken at their meeting of March 27, 1979, wherein all issues of MS were reviewed and two were returned to the library shelves is pretextual and self-serving. *Right to Read Defense Committee v. School Committee, supra,* at 712 and n. 14. Here as in *Right to Read, supra,* the publication was banned by the Board without reading it, the female Board members were "sheltered" from the alleged improper material, and no claim is advanced or supported that the publication is obsolete or worn out or that adequate shelf space is unavailable. Those cases which deal with "captive audiences" (*Close v. Lederle,* 424 F.2d 988 [1st Cir.], *cert. denied,* 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 [1970]) or with whether a magazine containing an allegedly "filthy" poem should be promoted rather than suppressed (*Advocates for Arts v. Thomson,* 532 F.2d 792 [1st Cir.], *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 [1976]) are inapposite.

■ The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). When First Amendment values are implicated, the local officials removing a publication must demonstrate some substantial and legitimate government interests. *Right to Read Defense Committee, supra,* at 713. We deal here with publications of obvious research value to *senior high school students, i. e.,* sophomores, juniors, and seniors ranging in age from 15 to 19. In *Keefe v. Geanakos,* 418 F.2d 359 (1st Cir. 1969), injunctive relief was granted a teacher threatened with discharge to assigning an article containing vulgarities to an English class of high school seniors, and discussing one of the vulgar words with them. In the course of its opinion, the court there said:

> Hence the question in this case is whether a teacher may, for demonstrated educational purposes, quote a 'dirty' word currently used in order to give special offense, or whether the shock is too great

for high school seniors to stand. If the answer were that the students must be protected from such exposure, we would fear for their future. We do not question the good faith of the defendants in believing that some parents have been offended. With the greatest of respect to such parents, their sensibilities are not the full measure of what is proper education.

*Id.* at 361, 362.

The defendants' contention as to the limited impact of the removal of MS magazine to the high school population, members of which are free to purchase or to read the publication in a public library, is without merit.[5] "Restraint on expression may not generally be justified by the fact that there may be other times, places, or circumstances available for such expression." *Minarcini, supra,* at 582 (and cases cited therein).

A library is "a mighty resource in the free marketplace of ideas . . . specially dedicated to broad dissemination of ideas . . . a forum for silent speech." *Minarcini, supra,* at 582, 583.

> There a student can literally explore the unknown and discover areas of interest and thought not covered by the prescribed curriculum. The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment. That student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom.
>
> The most effect antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control.

*Right to Read, supra,* at 715.

■ The Court finds and rules that the defendants herein have failed to demonstrate a substantial and legitimate government interest sufficient to warrant the removal of MS magazine from the Nashua High School library. Their action contra-

---

**5.** Plaintiff Salvail and students similarly situated who work after school are perforce limited to research in the school library during school hours. In such cases, reduction of the materials available for research effectively forecloses their right to conduct same.

venes the plaintiffs' First Amendment rights, and as such it is *plainly wrong*. *Mailloux v. Kiley*, 436 F.2d 565, 566 (1st Cir. 1971). The plaintiffs are entitled to relief at the hands of this Court.

## CONCLUSION

Upon the pleadings, the evidence in its entirety including the exhibits, and the briefs of counsel, the Court concludes:

 1. This action is properly maintained as a class action pursuant to Rule 23, Federal Rules of Civil Procedure. There are three subclasses, the first of which includes all students at Nashua High School (of which subclass plaintiff Salvail is a representative party); the second of which includes all faculty members at the Nashua High School (of which plaintiff Hodge is a representative party); and the third of which includes all students at Nashua High School who were in such position at the time of the events which give rise to this litigation (of which subclass plaintiff Cote is a representative party).[6]

2. The resolutions of the Nashua Board of Education of March 27, 1978, and March 27, 1979, are hereby declared null and void as in violation of the First Amendment to the United States Constitution.

3. The Nashua Board of Education and the members thereof are hereby enjoined from the continued withdrawal of MS magazine from the shelves of the Nashua High School library and are ordered to replace the issues they have caused to be removed and to resubscribe to MS magazine, such replacement and resubscription to be made, if necessary, by purchase out of the first sums available for library purposes.

4. The Nashua Board of Education and the members thereof are herewith enjoined and ordered to follow the current guidelines relative to any complaints about any publications in the Nashua High School library, whether said complaints are generated by a member of the Board or by any other Nashua resident.

---

**6.** The Court finds and rules that plaintiffs Coletta and Burrelle, described as "concerned residents and taxpayers" of Nashua lack standing

The foregoing shall constitute the Court's findings of fact and conclusions of law, consistent with Rule 52(a), Federal Rules of Civil Procedure.

SO ORDERED.

in this action, and the action is therefore dismissed as to them.