**Randal B. BROWN, et al., Plaintiffs,**

**v.**

**BOARD OF REGENTS OF the UNIVERSITY OF NEBRASKA, etc. et al., Defendants.**

**No. CV86–L–361.**

United States District Court, D. Nebraska.

June 25, 1986.

---

Friedman Law Offices, Healey, Wieland, Kluender, Atwood & Jacobs, Lincoln, Neb., for plaintiffs.

Richard R. Wood, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

"Hail Mary" is a movie depicting the birth of Jesus Christ in a contemporary setting. It was chosen, scheduled and advertised for showing at the Sheldon Film Theater, a state-operated art theater on the University of Nebraska campus. The showing was canceled because of its controversial content, and the issue now is whether the cancellation has denied the plaintiffs a constitutional right to see the film.

I conclude that it has.

### I. LIMITATION OF PARTIES AND ISSUES

As a preliminary matter, the Board of Regents of the University of Nebraska must be dismissed as a defendant. The Eleventh Amendment precludes a suit against the state. In determining whether an action is against the state, the Supreme Court in *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984), found that the Eleventh Amendment afforded protection to state agencies or departments, regardless of the type of relief sought. In addition, no evidence has been advanced which in any way implicates the Board of Regents in the decision to cancel the film.

### II. FACTUAL BACKGROUND

The Sheldon Film Theater is owned and operated by the University of Nebraska-Lincoln and housed within the Sheldon Memorial Art Gallery. The Gallery is a museum of art, where film as an art form is exhibited for the public by the theater. Films that are not typically shown at commercial theaters in Lincoln, Nebraska, are selected for viewing. The wide variety of

films shown include American independent, contemporary foreign, classic American and foreign, experimental, and documentary films. Defendant's Exhibit # 23. The operating expenses of the theater are paid by admission fees, University funds, and donations. Occasionally, organizations are permitted to rent the theater to show films.

The ultimate authority for selection of works of art rests with the Director of the Sheldon Memorial Art Gallery, George Neubert, but Neubert has largely delegated the responsibility for film selection to Dan Ladely, Director of the Sheldon Film Theater. Typically, Neubert's input into the decision-making is limited to signing film requisition forms, informally and infrequently discussing with Ladely upcoming films and making some suggestions about films to be shown. The one exception to the rule that Ladely chooses the films is that once a year the Friends of the Sheldon Theater, a group of donors, vote on a selected list of approximately fifty films.

Ladely selected "Hail Mary" because it was the most recent film directed by Jean-Luc Godard. At that time, Ladely was only "slightly aware" of the controversary surrounding the film's contemporary picturing of the birth of Christ. Ladely ordered the film "Hail Mary" on approximately December 27, 1985, and included it in the *Winter-Spring, 1986 Film Schedule* for showing on Thursday, May 29, 1986, through Sunday, June 1, 1986. Plaintiff's Exhibit # 5. On about January 13 the schedule was delivered to the press, to Friends of Sheldon Film Theater, and to patrons within the theater.

On about January 26, 1986, the *Lincoln Sunday Journal-Star* printed the scheduled dates for the running of the film. On about January 28 Ladely received four phone calls from individuals opposing the presentation of the film. One of them was from Senator Bernice Labedz, a member of the Nebraska legislature, who had received several citizens' expressions of disapproval of the film. Senator Labedz had not seen the film, but had read reviews of it. In her

call to Ladely, the senator articulated two reasons for wanting the film not to be shown: (1) it blasphemed the Blessed Virgin Mary and the birth of Christ, accordingly, its content offended the senator's religious precepts and (2) exhibition of the film might result in demonstrations by others who disagreed with the religious content of the film. Senator Labedz testified of her telephone conversation with Ladely:

"[T]he year prior to the time I was talking to him, there was a big controversy on the floor [of the legislature] whether or not the Sheldon Art Gallery should be closed, and I said that I didn't want to see them have that type of trouble; that there would be some very difficult times on the floor and that I myself would introduce a resolution then—Not waiting for the budget, I was going to introduce a resolution within the next week or so objecting to the film, and hoping that I would get the support of the senators on the floor, at least 25 of them, showing our objections to the film. And I said— But I did not want to call President Roskens, whom I consider a very personal friend of mine, or Chancellor Massengale, whom I consider a friend."

Plaintiff's Exhibit # 29:25—30:13.

In response to the question of whether she had suggested in any way that the University budget might be affected by showing the film, Senator Labedz replied:

"No, I did not. I said that there was a—unless he took it for granted that the resolution would do that. He did not—I did not tell him what I would introduce in the resolution, I just said I would introduce a resolution objecting to the film being shown at the University."

Plaintiff's Exhibit # 2, 31:12–16.

On January 29 Ladely responded in writing to the senator's concerns. He wrote that the film was not intended to be "blasphemous, inflammatory or prejudiced against the Catholic Church and its followers" and included several reviews of the film. Plaintiff's Exhibit # 9. Ladely also corresponded with Senator Don Wesely in the hope that Wesely could dissuade La-

bedz from further attempts to ban the film. Plaintiff's Exhibit # 17. Ladely also informed Neubert of Senator Labedz's phone call and of Ladely's subsequent written response. Neubert told Ladely to "handle" the "touchy" situation. However, later that day Neubert informed Ladely that the chancellor's office had expressed concern regarding Ladely's letters to Senators Labedz and Wesely and Ladely was directed to obtain Neubert's approval before officially communicating with any senator in the future. In addition, Neubert ordered Ladely to cancel the film because it was "offensive to a segment of society and did not merit the efforts it would take to defend it." Plaintiffs' Exhibit # 14. In the thirteen years in which Ladely has been employed by the University, his decision to present a film had never before been overruled.

On January 30 Ladely told Neubert that he had contacted the distributor of the film and informed it of Neubert's decision to cancel the film. Ladely thereafter obtained a print of the film for previewing by the Friends of Sheldon Film Theater Board of Directors and himself. Ladely invited Neubert to attend the "screening [which] will be strictly closed to the public." Plaintiff's Exhibit # 12. Neubert declined because he said the content of the film was not relevant to his decision.

On approximately February 4 and February 5 "Hail Mary" was previewed by a few people in a classroom at Bessie Hall on the campus. Invited viewers were the Board of Directors of the Friends of the Sheldon Film Theater, University of Nebraska-Lincoln Film Studies faculty, Sheldon Film Theater staff, Ladely, friends of Ladely, and the projectionist. Uninvited attendees were reporters from the *Daily Nebraskan*, the campus newspaper.

On February 6 Neubert wrote to the Board of Trustees of the Nebraska Art Association, a support group for the Sheldon Gallery, explaining the reasons for the film's cancellation:

"... The economical climate of the State caused the tightening of the University budget and placed the Sheldon Gallery in the forefront for 'cuts'.... In the last two Legislative sessions, the Appropriations Committee and entire Legislature voted to remove over 50% of the Sheldon's operating budget....

"During this present Legislative session, a new bill has been proposed to the Legislature [Legislative Bill 855, Defendant's Exhibit 21] by the Governor to essentially take away from the University, and has designated that the Gallery be under the State Arts Council.... Currently, the University is about to enter another budget process under even more difficult economic conditions which will undoubtedly touch the Sheldon again. It is within this climate of economic conditions and prevailing developments that I determined that a screening of this particular movie at this time could surely be used by politicians and some segments of the community for their personal or political gain which could only have further detrimental affect [sic] upon the University and its budget and particularly the Sheldon Gallery. To some, I realize, my judgment was not made on strict principle, but on what I, as Director, felt was pragmatic reality...."

\* \* \* \* \* \* \*

"... Dan [Ladely] received a ... call from a State Legislator expressing her concerns and that numerous constituents had contacted her in regard to the contents of "Hail Mary" and it being scheduled here at the Sheldon's Film Theater. Concurrently, I too realized calls of similar concerns from the community and began to realize that this film had become a 'cause celeb' and because of the potential political use and abuse and possible 'fall-out' on the Sheldon, I determined that the best 'compromise' was to withdraw the film. Now, the issue of principle.... I did not want to be drawn into the public arena in defense of a film I had not seen or to justify it as a work of art or otherwise draw a line of principle...."

Plaintiff's Exhibit # 13.

The Sheldon Gallery operates independently of the University academic program

and there is no evidence that any university official, other than Neubert himself, influenced or attempted to influence Neubert's decision.

This was not the first time that a scheduled film has been cancelled at the Sheldon theater. Ladely cancelled the documentary film, "The Gods Must Be Crazy," after viewing it in Omaha, Nebraska. The only phone calls Ladely received concerning the film were in opposition to its cancellation. Ladely found that the film glossed over life in South Africa and was not racially balanced. In addition, the film was scheduled for presentation in a commercial theater in Lincoln, Nebraska, prior to its screening at the Sheldon, and Ladely "almost always cancels" a film upon learning that it is to be shown elsewhere. It is significant that Ladely was not pressured into cancelling "The Gods Must Be Crazy".

### III. FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION AND IDEAS

When the Supreme Court of the United States gives voice to an issue, I am obliged to be guided by its path as precisely as I can determine its direction. *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), provided an occasion for guidance, but the justices pointed in all directions. No less than seven separate written opinions addressed the issue of whether the members of a board of education could constitutionally remove from a high school and junior high school library books the board had characterized as "Anti-American, Anti-Christian, Anti-Sem[i]tic, and just plain filthy." The Court of Appeals had remanded the case for a trial on the merits and the Supreme Court affirmed. The plurality opinion found the First Amendment rights of the students infringed by the removal of books from the library shelves, reasoning that the First Amendment not only fosters individual self-expression but ensures public access to the "spectrum of available knowledge." *Id.* at 866, 102 S.Ct. at 2807. Consequent-

ly, it said, an inherent corollary of the rights of free speech and press is the right to receive information and ideas, and the right to receive ideas necessarily inures from the sender's constitutional right to disseminate ideas. Moreover, it declared that the right to receive ideas is fundamental to "the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id.* at 867, 102 S.Ct. at 2808. Thus, the opinion said:

> "[S]tudents may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.... [S]chool officials cannot suppress 'expressions of feeling with which they do not wish to contend.'" *Id.* at 868, 102 S.Ct. at 2808 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (C.A. 5th Cir.1966)).

The plurality opinion concluded that the broad discretion granted school boards in the management of school affairs is limited by the First Amendment proscription that the decision not be impermissibly motivated. Freedom of speech and press prohibits the official suppression of *ideas.* Therefore, the Constitution is violated where the "decisive factor" in a school board's decision is the intent to deny the students access to the ideas with which the board disagrees. *Id.* 457 U.S. at 871, 102 S.Ct. at 2810. The opinion defined "decisive factor" as a substantial factor "in the absence of which the opposite decision would have been reached." *Id.* at 871, n. 22, 102 S.Ct. at 2810 n. 22.

Justice Blackmun drew a narrower description of the right of a recipient than did Justice Brennan, the author of the plurality opinion, saying at p. 879, 102 S.Ct. at 2814, that:

> "[S]chool officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved."

The perimeter of either the plurality opinion or the opinion of Justice Blackmun encloses the facts of the present case.

The Eighth Circuit Court of Appeals, in *Pratt v. Independent School District No. 831, Forest Lake,* 670 F.2d 771 (C.A. 8th Cir.1982), reviewed the constitutionality of the school board's removal of a film version of the short story "The Lottery" from senior high school literary courses after a group of parents and other citizens petitioned the school board to ban the film because of the alleged violence and purported negative effect on the religious and family values of the students.

The Eighth Circuit held that the school board, to overcome the plaintiff's showing that the board banned the film because of the objectionable ideas expressed, must

"establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information ... Bare allegations that such a basis existed are not sufficient." (citations omitted).

*Id.* at 777.

 At trial, Neubert gave three reasons for cancelling the film: (1) controversy surrounding the film, (2) the likelihood of a demonstration by those opposing the film, and (3) the political climate. I conclude that the pivotal factor was a combination of (1) and (3): controversy within the political climate. The Sheldon Film Theater has exhibited many controversial films; there was nothing unique about having a controversy. It was not the fact of controversy that caused the cancellation of "Hail Mary". It was that the prospect of a religious battle in the uneasy political setting of the time—already penciled in by prior legislative cuts and underlined by an individual senator's warnings—threatened the peace and stability of the Sheldon Gallery. Even if the cause had been only the fact of controversy, however, cancellation would not have been justified, because action taken by an arm of the state merely to avoid controversy from the expression of ideas is an insufficient basis for interfering with the right to receive information. See *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 510, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969). In the decision to cancel the film, Neubert's foremost concern was not that the Gallery and its collections would be damaged by demonstrators. That consideration was not highlighted in Neubert's testimony, and he did not even mention it in his letter to the Board of Trustees of the Nebraska Art Association outlining the reasons for the film's cancellation. Furthermore, in *Tinker v. Des Moines Independent Community School District,* supra, at 508–509, 89 S.Ct. at 737–38, the Supreme Court rejected the contention that the action of school authorities was reasonable because it was premised upon the fear of a disturbance.

"But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk ... and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society."

'Freedom of expression' guarantees Senator Labedz the right to object openly to the presentation of the film "Hail Mary". The First Amendment precludes a gallery director or a legislator or the legislature as a whole "from imposing a 'pall of orthodoxy' ... which implicates the state in the propagation of a particular religious or ideological viewpoint." See *Pratt v Independent School District No. 831, Forest Lake,* supra, at 776.

When the senator demanded the banning of the film, Neubert felt compelled to withdraw from the chilly political winds. The legislature had previously reduced state funding and Neubert, not unreasonably, concluded that further budget cuts might

be forthcoming were he to disregard the legislator's wishes. The constitution interjects safeguards against just this type of governmental influence. The effect of such unauthorized use of political power is obvious and the precedent is untenable.

"What is at stake is the right to receive information and to be exposed to controversial ideas—a fundamental First Amendment right. If [the film] can be banned by those opposed to [the] ideological theme, then a precedent is set for the removal of any such work."

*Id.* at 779.

The splintered nature of the decision in *Board of Education, Island Trees Union Free School District No. 26 v Pico,* supra, invites a noting of facts in this case different from those in the *Pico* case. Here, two elements provide added impetus toward the plurality opinion. First, the denial of information here was on a college campus, rather than in a junior and senior high library. Chief Justice Burger, Justice Powell and Justice Rehnquist specifically mention the youth of the targeted recipients. See, for example, Burger, C.J., dissenting *Id.* 457 U.S. p. 885 and 892, 102 S.Ct. at p. 2817 and p. 2821; Powell, J., dissenting *Id.* p. 897, 102 S.Ct. p. 2832; Rehnquist, J., dissenting *Id.* pp. 920, 102 S.Ct. pp. 2835. Justification for guarding junior high and high school students from material thought to be offensive is more easily found than for guarding college students and the general public from it.

Second, two of the dissents, that of Justice Rehnquist and that of Justice O'Connor, noted the special role of government when it was acting as educator. Justice Rehnquist said:

"I think the Court will far better serve the cause of First Amendment jurisprudence by candidly recognizing that the role of government as sovereign is subject to more stringent limitations than is the role of government as employer, property owner, or educator. It must also be recognized that the government as educator is subject to fewer strictures when operating an elementary and secondary school system than when operating an institution of higher learning...."

Here, the facts show only slight involvement of the government as an educator on a college campus—slight because the theater showings are for the public at large and are no part of the academic program of the university—and direct intrusion by the government as a sovereign. Senator Labedz was not merely speaking out as a private citizen; she purposely used her position as a legislator who had a hand on the financial throat of the Sheldon Gallery to prevent the showing of the film. This case is a stronger case for the plaintiffs than the *Pico* case was for its plaintiffs.

## IV. SHELDON FILM THEATER AS A PUBLIC FORUM.

The First Amendment not only safeguards free speech and press, but public places for purposes of expressive activity. A constitutional right of access to a public forum is guaranteed to all. However, this concept of equal access does not attach to government property which is not a public forum.

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue".

*Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In *Perry,* the Supreme Court concluded that a public school district, pursuant to a collective bargaining agreement, could constitutionally limit access of the interschool mail system and teacher mailboxes to the union that was the exclusive bargaining agent of the teachers. The Court found that the First Amendment was implicated by denying a rival union access rights to the mail facilities because free speech applied to teacher mailboxes.

The Court identified three public forums. First, the "quintessential public forums" are the streets, sidewalks, and parks, "which ... [from] time out of mind, have been used for purposes of assembly, com-

municating thoughts between citizens, and discussing public questions." *Id.* at 45, 103 S.Ct. at 955. Second, property the state has generally opened for use by the public for expressive activity. The same constitutional standards apply to both classifications. The government may neither prohibit all communicative activity nor enforce a content-based exclusion where the regulation is not narrowly drawn to serve a compelling state interest. *Id.* Third, where public property which is not by tradition or designation a forum for public communication is involved, there is no per se constitutional right of access. The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.* at 46, 103 S.Ct. at 955. Consequently, the state may (1) reasonably regulate the time, place, and manner of the expressive activity and (2) reserve the forum for its intended purpose, communicative or otherwise, provided:

> "the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views."

*Id.*

The Court determined that the school mail facilities fit the third classification despite prior utilization of the teacher mailboxes by a rival union and several civic and church organizations. The School district, in neither policy nor practice, had opened its mail system to indiscriminate use by the general public. Permission to use the mail system was required, but not automatically granted by the building principal. The Court concluded that "selective access does not transform government property into a public forum." *Id.* at 47, 103 S.Ct. at 956. Moreover, "the mere fact that an instrumentality is used for the communication of ideas does not make a public forum...." *Id.* at 49, n. 9, 103 S.Ct. at 957, n. 9.

■ The reasons stated in *Perry* are equally applicable to this case. The Sheldon Film Theater has not consented to unrestricted access by the general public to its auditorium and facilities. Permitting the Friends of the Sheldon Film Theater, once a year, to choose from a selected list of films and organizations to infrequently rent the theater, does not evidence relinquishment of editorial control over the selection of the films presented. Consequently, the theater may not be characterized as a public forum.

Since the Sheldon Film Theater fits within the third category of public forums, reasonable limitations may be placed on expression. However, the Supreme Court clearly indicated that the restrictions may not suppress expression. This court has previously determined that the Sheldon Film Theater unconstitutionally canceled "Hail Mary" because of an unnerving campaign to suppress its content because it was at odds with a public official's religious views.

## V. CONCLUSION

■ The decision to cancel the film "Hail Mary" was not independent of state involvement; rather, were it not for the intervention of a state legislator, the film would have been presented as scheduled. University students were denied the right to receive the controversial ideas expressed in the film "Hail Mary" because its content was officially characterized as offensive. Since the expression was unconstitutionally suppressed, the film "Hail Mary" must be reinstated in the Sheldon Film Theater schedule. As aptly expressed by Mr. Justice Black:

> "I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." *Communist Party v. Subversive Activities Control Board,* 367 U.S. 1, 137, 81 S.Ct. 1357, 1431, 6 L.Ed.2d 625 (1961) (dissenting opinion).

I make not the slightest indication that the film should be seen by anybody. Viewers may see it or not see it, as they choose.

I do hold that once the film was selected and advertised for showing to university

students and the general public, the state cannot now withdraw it, foreclosing everybody from seeing it because it conflicted with somebody's or many people's religious views. Whether the University should have selected and advertised it for viewing in the first place, I do not decide. That issue was not presented to me and I have no right to decide it.

## VI. RELIEF

■ A suit which is brought against a state official is actually a suit against the state where "the state is the real, substantial party in interest." *Id.* at 101, 81 S.Ct. at 1413. Such a suit against a state official is barred by the Eleventh Amendment whether it seeks damages or injunctive relief. *Id.* at 101–102, 81 S.Ct. at 1413. The recognized exception is that where a violation of federal law by a state official is established, "the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Id.* at 102–103, 81 S.Ct at 1414. Thus, the plaintiffs in this case could not be awarded general or punitive damages in any event.

■ The complaint does not make clear whether George Neubert was being sued in his official capacity or in his individual capacity. Insofar as suit is against him in his official capacity, the memorandum of decision accurately said that the Eleventh Amendment barred the award of damages. Insofar as the suit may be against the defendant in his individual capacity, he has pleaded and is entitled to good faith immunity. The fact that he violated a constitutional right of the plaintiffs is not sufficient to subject him to personal liability, unless he violated a right that was clearly established and that a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The law of the specific subject remains in doubt to this day; it was not so clearly established when Neubert made his decision that a reasonable person would have known that what he did was a violation of a constitutional right. Accordingly,

no damages are awardable against the defendant Neubert in his individual capacity.

The relief will take the form of a declaration that the action of George Neubert in cancelling the film was a denial of the plaintiffs' right under the First Amendment of the Constitution of the United States to receive information and ideas, declaring null and void that decision, enjoining the defendant and those participating with him from preventing the making, showing, and presentation of the film by the Sheldon Film Theater, and awarding the plaintiffs' attorney's fees and expenses.

## VII. ADDENDUM

I add two observations by way of addendum. Neither makes any difference to my decision.

First, I have viewed "Hail Mary". It is what critics have called it. From time to time its parts are dull, beautiful, incomprehensible, brave, shallow, penetrating, vulgar, demeaning and, no doubt, blasphemous for some and inspirational for others.

■ Second, a petition signed by many people has come to my office. It is not in evidence and I have no reason to think that any of the attorneys or parties know of it. I have made a point of not counting the names or seeing whether I know any of them. Lawsuits are not matters for resolution by petition. It is the Constitution that must govern the disposition of this case and no vote of the people can affect a right guaranteed by it, unless it is one amending the Constitution itself.