670 F.2d 771
 64 A.L.R.Fed. 757, 2 Ed. Law Rep. 990
 Steven E. PRATT and Timothy B. Pratt by Douglas C. Pratt,
their father and next friend; Sherri Ann Siniff and L.
Cathleen Siniff by Edna Siniff, their mother and next
friend; Dawn Krinke by Dorothy E. Krinke, her mother and
next friend, individually and on behalf of others similarly
situated, Appellees,
v.
INDEPENDENT SCHOOL DISTRICT NO. 831, FOREST LAKE, MINNESOTA,
Appellant.
Vernon Boettcher, individually and as a member of the School
Board of Independent School District No. 831; Carl Graff,
individually and as a member of the School Board of
Independent School District No. 831; John Jergens,
individually and as a member of the School Board of
Independent School District No. 831; Edith Steinmann,
individually and as a member of the School Board of
Independent School District No. 831; Rita Tetrault,
individually and as a member of the School Board of
Independent School District No. 831; Richard Traugott,
individually and as a member of the School Board of
Independent School District No. 831; Joanne Weeks,
individually and as a member of the School Board of
Independent School District No. 831; Bernhard Bartel,
individually and as the Superintendent of Schools of
Independent School District No. 831; and Russell Cooper,
individually and as principal of Forest Lake High School,
Forest Lake, Minnesota.
 No. 81-1579.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 14, 1981.
Decided Jan. 13, 1982.
 
 Peterson, Popovich, Knutson & Flynn, Paul C. Ratwik, argued, Patricia A. Maloney, St. Paul, Minn., for appellant.
 Dayton, Herman, Graham & Getts, Philip W. Getts, argued, Minnesota Civil Liberties Union by Linda Ojala, Minneapolis, Minn., for appellees.
 Before LAY, Chief Judge, HEANEY, Circuit Judge, and HUNTER,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 I. INTRODUCTION.
 
 
 2
 "The Lottery" is a short story by American author Shirley Jackson in which the citizens of a small town randomly select one person to be stoned to death each year. Since 1972, the curriculum of Independent School District No. 831, Forest Lake, Minnesota, has included the Encyclopedia Brittanica Educational Corporation's film version of "The Lottery," and its accompanying "trailer" film which discusses the story and its themes.
 
 
 3
 During the 1977-1978 school year, a group of parents and other citizens became concerned about the use of the films in American literature courses taught in the senior high school, and sought to have them removed from the District's curriculum. The citizens' objections focused on the alleged violence in the films and their purported impact on the religious and family values of students.
 
 
 4
 After the citizens had pursued their complaints through the appropriate procedures for review and selection of instructional materials, the school board acceded to their demands and voted to remove the films from the District's curriculum. This action was then commenced in United States District Court for the District of Minnesota by three students enrolled in the junior and senior high schools operated by District No. 831. They sought to compel District No. 831 to reinstate the film version of "The Lottery" and its trailer film to the high school curriculum.
 
 
 5
 After a hearing, the district court found that the board's objections to the films had "religious overtones" and that the films had been banned because of their "ideological content." It held the school board's decision violated the First Amendment and ordered the films reinstated to their prior place in the curriculum. We affirm. Under the circumstances presented here, the First Amendment protects the right of the Forest Lake students not to have these films removed from the high school classrooms. The school board cannot constitutionally ban the films because a majority of its members object to the films' religious and ideological content and wish to prevent the ideas contained in the material from being expressed in the school.
 
 
 6
 II. FACTS.
 
 
 7
 Independent School District No. 831 serves the communities of Forest Lake, Linwood and Wyoming, Minnesota, and provides public education to approximately 6,500 students. A seven-member school board is elected by residents of the district to govern the School District.
 
 
 8
 In the winter of 1977, several parents of students enrolled in the high school became concerned about the use of "The Lottery" and trailer films in American literature courses. After the parents had voiced their concern to the teachers, an informational meeting was held on February 21, 1978, at the high school. Approximately fifty people attended, including several board members and teachers. Both films were shown at the beginning of the meeting. Several teachers discussed how they used the films and their reasons for using them. Essentially, they explained that the films were used to study the interpretation of fiction and "The Lottery" 's place in American literature, and to provoke discussion of the consequences of blind adherence to tradition. Numerous objections to the films were raised by the parents and other members of the public. The objections centered on the films' alleged violence and impact on the religious and family values of students.
 
 
 9
 Shortly after the informational meeting, three parents filed formal Citizens' Requests for Reconsideration of Instructional Materials, asking that the film version of "The Lottery" and its trailer be removed from the curriculum.[1] The Citizens' Requests were filed pursuant to Instructional Policy No. 605, which sets forth the District's procedures for selection and review of instructional materials.[2]
 
 
 10
 A Committee for Challenged Materials (Challenge Committee) conducted a public meeting on March 28, 1978, to review the films and adopt a recommendation with regard to their future use. Notice of the meeting appeared in local newspapers and, once more, approximately fifty people attended. Again, the films were shown to those in attendance and the teachers discussed their reasons for using the material. Persons in attendance were then given an opportunity to express their views. Those opposing the films raised essentially the same objections as those advanced at the February informational meeting and in the Citizens' Requests.
 
 
 11
 At the conclusion of the meeting, the Challenge Committee recommended that the films not be used at the junior high school level, that the films be included in the curriculum in the high school, and that before the films be shown, an information sheet be sent to the students' parents advising them they could exclude their children from viewing the films.
 
 
 12
 The Committee's recommendations were appealed to the school board. At a public meeting held on April 17, 1978, the board, by a four-to-three vote, rejected a motion to "accept and confirm" the Challenge Committee's recommendations. The board then passed a resolution, again by a vote of four-to-three, to completely eliminate the film and the trailer from the District's curriculum. The board gave no reasons for its decision.
 
 
 13
 The plaintiffs then commenced this action. The district court, on cross-motions for summary judgment, found that the material was unconstitutionally excluded because of its "ideological content and its alleged adverse impact upon the students' family, religious, and moral values," and ordered the films to be reinstated to their prior place in the curriculum. The district court, however, gave the board an opportunity to present evidence that its actions were based on reasons that did not offend the First Amendment. Rather than presenting additional evidence, however, the board submitted a resolution which stated in part:
 
 
 14
 The motion picture version of "The Lottery" and the trailer film discussing the short story graphically place an exaggerated and undue emphasis on violence and bloodshed which is not appropriate or suitable for showing in a high school classroom and which has the effect of distorting the short story and overshadowing its many otherwise valuable and educationally important themes.[3]
 
 
 15
 The district court found that this resolution did not constitute "cognizable, credible evidence as to any legitimate reason for excluding" the films from the curriculum. It, therefore, affirmed its earlier order to reinstate the films. This appeal followed.
 
 
 16
 III. DISCUSSION.
 
 
 17
 Local authorities are the principal policymakers for the public schools. Thus, school boards are accorded comprehensive powers and substantial discretion to discharge the important tasks entrusted to them. E.g., Pico v. Board of Education, Island Trees Union Free School District, 638 F.2d 404, 412 (2d Cir. 1980) (opinion of Sifton, J.);[4] Zykan v. Warsaw Community School Corp., 631 F.2d 1300, 1304-1305 (7th Cir. 1980); Minarcini v. Strongsville City School District, 541 F.2d 577, 580 (6th Cir. 1976). As the Supreme Court stated in Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968):
 
 
 18
 By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. (Footnote omitted.)
 
 
 19
 Necessarily included within the board's discretion is the authority to determine the curriculum that is most suitable for students and the teaching methods that are to be employed, including the educational tools to be used. Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 425 (Mansfield, J., dissenting).[5] These decisions may properly reflect local community views and values as to educational content and methodology. James v. Board of Education of Central District No. 1, 461 F.2d 566, 573 (2d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972).
 
 
 20
 Notwithstanding the power and discretion accorded them, school boards do not have an absolute right to remove materials from the curriculum. E.g., Minarcini v. Strongsville City School District, supra, 541 F.2d at 581; Right to Read Defense Committee of Chelsea v. School Committee of City of Chelsea, 454 F.Supp. 703, 711 (D.Mass.1978). Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); Minarcini v. Strongsville City School District, supra, 541 F.2d at 583. At the very least, the First Amendment precludes local authorities from imposing a "pall of orthodoxy" on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint. See Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); Zykan v. Warsaw Community School Corp., supra, 631 F.2d at 1306. Thus, the students here had a right to be free from official conduct that was intended to suppress the ideas expressed in these films. See Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 433 (opinion of Newman, J.).
 
 
 21
 There has been a flurry of cases recently in which the federal courts have considered First Amendment challenges to the removal of books from school libraries. Those courts have generally concluded that a cognizable First Amendment claim exists if the book was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed. Pico v. Board of Education, Island Trees Union Free School District, supra; Bicknell v. Vergennes Union High School Board, 638 F.2d 438 (2d Cir. 1980) (dicta); Zykan v. Warsaw Community School Corp., supra (dicta); Cary v. Board of Education, Adams-Arapahoe School District, 598 F.2d 535 (10th Cir. 1979) (dicta); Minarcini v. Strongsville City School District, supra; Salvail v. Nashua Board of Education, 469 F.Supp. 1269 (D.N.H.1979); Right to Read Defense Committee of Chelsea v. School Committee of City of Chelsea, supra. We believe that this focus provides the proper framework for analysis here.[6]
 
 
 22
 The district court found that the objections of the board's majority had "religious overtones" and that the films had been eliminated because of their "ideological content." It concluded that the plaintiffs had established a prima facie case that the board's action was unconstitutional. The district court's findings are not clearly erroneous.
 
 
 23
 Opponents of "The Lottery" focused primarily on the purported religious and ideological impact of the films. They contended that the movies must be removed from the curriculum because they posted a threat to the students' religious beliefs and family values.[7]
 
 
 24
 In contrast to these value-laden objections, several teachers testified that "The Lottery" is an important American short story, that the film was faithfully adapted from the short story, that the story stimulates students to consider new ideas, and that the films are an effective teaching tool and involve students who might not otherwise read the story. Moreover, an empirical study conducted by two University of Maryland education professors was provided to the board, which concluded that the film version of "The Lottery" produced no negative effects on students in terms of violence and attitudes toward family or religious values.[8] Forest Lake teachers attending the February and March meetings concurred with this assessment of the effect of the films.
 
 
 25
 After hearing these contrasting points of view, the Challenge Committee set up to evaluate the dispute recommended that the films be retained in the high school curriculum. But the board, obviously in response to the citizens' objections and without offering any reasons for its action, decided to remove the films from all of the District's schools.
 
 
 26
 On these facts, the district court could properly conclude that the plaintiffs met their burden of establishing that the board banned the films because the majority of its members objected to the ideas expressed in them.[9]
 
 
 27
 Therefore, to avoid a finding that it acted unconstitutionally, the board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information. Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 415-416 (opinion of Sifton, J.); Minarcini v. Strongsville City School District, supra, 541 F.2d at 581-582; Right to Read Defense Committee of Chelsea v. School Committee of City of Chelsea, supra, 454 F.Supp. at 712-713. Bare allegations that such a basis existed are not sufficient. Pico v. Board of Education, Island Trees Free Union School District, supra, 638 F.2d at 415 (opinion of Sifton, J.).
 
 
 28
 The board's purported rationale for its action, offered in its resolution to the district court, was that
 
 
 29
 (t)he motion picture version of "The Lottery" and the trailer film discussing the short story graphically place an exaggerated and undue emphasis on violence and bloodshed which is not appropriate or suitable for showing in a high school classroom and which has the effect of distorting the short story and overshadowing its many otherwise valuable and educationally important themes.
 
 
 30
 The district court concluded that this resolution did not provide a sufficient basis to justify the board's action. The district court found that "the self-serving statements of the school board, made after the fact and not based on the previous record, to the effect that this film is excluded because of the violence it teaches, are untenable in the light of the circumstances under which they were made." It further found that the school board has "failed to produce any cognizable, credible evidence as to any legitimate reason for excluding this film (sic), other than the fact that the School Board and certain elements of populace object to the ideas disseminated therein." Once again, these findings are not clearly erroneous.
 
 
 31
 First, the contention that the films graphically emphasize violence is simply not supported by the facts. The two films contain but a single scene showing any physical violence-and that scene in the final brief frames of the main film is faithfully adapted from the short story.
 
 
 32
 Second, no systematic review of violence in the curriculum has been undertaken by the board. Indeed, there is no evidence that the board has ever removed from the high school curriculum any materials other than the films in dispute here because of their violent content.
 
 
 33
 Third, and most importantly, the sequence of events set forth above supports the district court's findings. Parents and citizens sought to have the films removed largely on the basis of the purported negative impact the material would have on the religious and family values of students. In response to these objections, teachers stated that "The Lottery" and trailer films are valuable pedagogical resources. On this evidence, the Challenge Committee recommended that films be retained in the high school curriculum. Nonetheless, the board voted to ban the showing of the films in the District. The board gave no reasons for its decision. Only after the district court invited the appellant to submit evidence showing that its decision was based on reasons neutral in First Amendment terms did the board attempt to justify its action by stating it was concerned with the violence in the films. Even then, the board did not produce any evidence but, instead, merely submitted its conclusory resolution reciting its purported concern about violence without any support.
 
 
 34
 The board-not this Court-has the authority to determine that a literary or artistic work's violent content makes it inappropriate for the District's curriculum. But after carefully reviewing the record, we must agree with the district court that the board eliminated the films not because they contain scenes of violence or because they distort the short story, but rather it so acted because the majority of the board agreed with those citizens who considered the films' ideological and religious themes to be offensive.
 
 
 35
 Moreover, the First Amendment requires, in a situation such as the instant one, that the school board act so that the reasons for its decision are apparent to those affected. The rationale for this requirement is summarized in Keyishian v. Board of Regents, supra, 385 U.S. at 603-604, 87 S.Ct. at 683-684:
 
 
 36
 "We emphasize once again that '(p)recision of regulation must be the touchstone in an area so closely touching our most precious freedoms,' * * * When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone ....' * * * The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform ... what is being proscribed." (Citations omitted; emphasis added.)
 
 
 37
 Here, the board, in response to citizens' complaints that centered on their ideological and religious beliefs, banned the films without giving any reasons for its actions. Only after the district court asked for an explanation of the board's action did it offer its violence rationale. Even then, the board failed to specify why the films were too violent or how they distorted the short story. This approach inevitably suggests that the Board acted not out of its concern about violence, but rather to express an "official policy with respect to God and country of uncertain and indefinite content which is to be ignored by pupils, librarians and teachers at their peril." Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 416 (opinion of Sifton, J.). Consequently, the board failed to "clearly inform" students and teachers what it was proscribing as the constitution requires.
 
 
 38
 The board seeks to justify its action by pointing out that the short story remains available to teachers and students in the library in printed form and a photographic recording.[10] This fact is not decisive. Restraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression. Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 434 (opinion of Newman, J.); Minarcini v. Strongsville City School District, supra, 541 F.2d at 582. The symbolic effect of removing the films from the curriculum is more significant than the resulting limitation of access to the story. The board has used its official power to perform an act clearly indicating that the ideas contained in the films are unacceptable and should not be discussed or considered. This message is not lost on students and teachers, and its chilling effect is obvious. Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 436 (opinion of Newman, J.).
 
 
 39
 For these reasons, the appellant has failed to carry its burden of establishing that a substantial governmental interest existed for interfering with the students' right to receive information. Hence, the board's action violated the First Amendment. Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 418 (opinion of Sifton, J.); Salvail v. Nashua Board of Education, 469 F.Supp. 1269, 1276 (D.N.H.1979); Right to Read Defense Committee of Chelsea v. School Committee of City of Chelsea, supra, 454 F.Supp. at 713-714. The school board premised its action on the assumption that scenes offensive to the majority of the board and some parents had no place in the Forest Lake school system. This action was impermissible.
 
 
 40
 "The Lottery" is not a comforting film. But there is more at issue here than the sensibilities of those viewing the films. What is at stake is the right to receive information and to be exposed to controversial ideas-a fundamental First Amendment right. If these films can be banned by those opposed to their ideological theme, then a precedent is set for the removal of any such work.
 
 
 41
 In sum, while we are mindful that our role in reviewing the decisions of local school authorities is limited, we also have an obligation to uphold the Constitution to protect the fundamental rights of all citizens. As the Supreme Court stated in Epperson v. Arkansas, supra, 393 U.S. at 104, 89 S.Ct. at 270:
 
 
 42
 Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief. * * * "(t)he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, 236 (1960).
 
 
 
 *
 The Honorable ELMO B. HUNTER, United States Senior District Judge, for the Western District of Missouri, sitting by designation
 
 
 [1]
 The Citizens Request to remove the main film from the curriculum stated that the "theme or purpose" of this film was "the breakdown of family values and tradition" and that viewing the films may cause students to "begin to question their own family loyalties." It also stated that "the matter of fact way in which the ceremony proceeds accentuates its brutality and senselessness in our times."
 The Citizens Request regarding the trailer film stated that the "theme or purpose" of the trailer was a "subtle way of accomplishing destruction of family unit. Causing them (the students) again to question their values, traditions and religious beliefs." This Citizens Request also objected to the portrayal of a "vengeful God" rather than a "loving God."
 
 
 [2]
 This procedure provides for three levels of review of a citizen's complaint. First, the objection to the material must be made to the person having control over the questioned material. If the challenge is not resolved with the media specialist or teacher, the citizen has a right to have his objections evaluated by a Committee for Challenged Materials which is set up to review the complaint. The seven-person Challenge Committee-composed of two citizens, two teachers, one media person, one administrator and one student-has the duty to evaluate the material based on the criteria set forth in the policy, and make a recommendation regarding its future use. Finally, if the Challenge Committee's recommendation is unsatisfactory, the challenger has a right to appeal to the school board
 
 
 [3]
 The full text of the board's resolution stated:
 The motion picture version of "The Lottery" and the trailer film discussing the short story graphically place an exaggerated and undue emphasis on violence and bloodshed which is not appropriate or suitable for showing in a high school classroom and which has the effect of distorting the short story and overshadowing its many otherwise valuable and educationally important themes. Consequently, the two films neither enrich nor met the needs of the curriculum and clearly do not constitute the most suitable medium for the presentation of the short story "The Lottery" in senior high school classes. This action is not, however, intended to limit in any manner the use of "The Lottery" as written literature nor limit classroom discussion of the short story.
 
 
 [4]
 In Pico v. Board of Education, Island Trees Union Free School District, 638 F.2d 404 (2d Cir. 1980), a three-judge panel, with one member dissenting, held that a school board's removal of books from the library gave rise to a cognizable First Amendment claim by students. The two judges in the majority relied on different rationales for their decisions, and each authored a separate opinion
 
 
 [5]
 Judge Mansfield summarized the basis of his dissent as follows:
 (In President's Council, District 25 v. Community School Board, No. 25, 457 F.2d 289 (2d Cir.), cert. denied, 409 U.S. 998 (93 S.Ct. 308, 34 L.Ed.2d 260) (1972)), we held that the removal from the school library by school authorities of a book containing vulgar language and explicit sexual allusions did not sharply and directly infringe upon freedom of speech and thought within the meaning of (Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)). That holding represents the law of this Circuit, by which we are bound.
 Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 429 (Mansfield, J., dissenting).
 
 
 [6]
 These cases cannot be distinguished on a principled basis from the instant one even though films rather than books were involved here and even though "The Lottery" remained available to students in forms other than film. That is because the effect of banning the films due to their ideological and religious content is the same as the effect of removing books from a library for the same reasons. In both situations, the action of the school officials clearly indicates that the ideas contained in the banned materials are unacceptable and, hence, the exercise of First Amendment freedoms is inhibited
 The appellant relies primarily on President's Council School District No. 25 v. Community School Board, No. 25, supra, which upheld a school board's removal of a book from the school library, to argue that the Forest Lake board acted within its discretion and that the removal of materials from the curriculum is not significant enough to rise to the level of a constitutional violation. We disagree. Because the officials in President's Council removed the book due to the extensive violence and sex it contained, we do not believe that it is necessarily inconsistent with our decision here. See Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 435-436 (opinion of Newman, J.); Right to Read Defense Committee of Chelsea v. School Committee of the City of Chelsea, 454 F.Supp. 703, 711 (D.Mass.1978).
 
 
 [7]
 The appellant correctly observes that several opponents of the films at the two meetings objected to the violence contained in the materials. But many of the objections to the films in fact reflected disapproval of the religious and ideological content of the films. For example, one parent asked, "Why is it being used in school, questioning the child's faith in God?" Another stated that "They are questioning tradition of Judeo-Christian God who is vengeful. Kids will pick up this thinking." Another citizen stated:
 They equated the stoning with the shedding of blood for the atonement for wrongdoing or for the good of society. This is the very basis of Christianity, the shedding of blood, but this slanted view of a God that is blood thirsty is out and out blasphemy. Our God is a God of love that demands nothing of us but pours out his love to us even though man keeps blowing it and he made this all possible not through a violent scene of the town throwing rocks at its members but rather a sacrifice of himself for us. This slanted view of old morality and of that kind of a God will bring about doubts and fears in children that instead need to be reinforced in love. They need to believe in something that is permanent and not in fluctuating morals that are based on your man. This also puts a wedge between parents and children.
 Also see n.1, supra, regarding the grounds for removal asserted in the Citizens' Requests.
 
 
 [8]
 The study, entitled "The Lottery": An Empirical Analysis of Its Impact, attempted to measure the impact of the film by examining changes in the attitudes of high school students toward God, tradition, community and violence
 
 
 [9]
 No discussion was held at the meeting at which the board voted to remove the films from the curriculum because the board members were familiar with the films and the Citizens' Requests, and had attended the prior meetings or reviewed transcripts of the meetings. Thus, the district court did not commit clear error in deducing the board's reasons for its decision from the transcripts of the two public meetings and the Citizens' Requests
 
 
 [10]
 The board also argues that it acted constitutionally because it complied with the procedural requirements of Policy No. 605. This argument is unavailing. Even strict procedural compliance with the board's policy cannot save a decision whose substance violates the Constitution. See Pico v. Board of Education, Island Trees Union Free School District, supra, 638 F.2d at 417 (opinion of Sifton, J.); James v. Board of Education of Central District No. 1, 461 F.2d 566, 574 (2d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972)