[No. F008947. Fifth Dist. Jan. 13, 1989.]

LEE McCARTHY et al., Plaintiffs and Appellants, v.
DOUGLAS FLETCHER, as Principal-Superintendent, etc. et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

**COUNSEL**

Paul L. Hoffman, Gary Williams, Carol A. Sobel and Patricia Erikson for Plaintiffs and Appellants.

Mary D. Nichols, Ricki L. Seidman, Tuttle & Taylor, Merrick J. Bobb, Robin D. Wiener, Ennis, Friedman & Bersoff, Kit Adelman-Pierson and Bruce J. Ennis, Jr., as Amici Curiae on behalf of Plaintiffs and Appellants.

Hekete, Carton, Hartsell, Chambers, Gross, Ronich & Peters (Bakersfield) Frank J. Fekete, Peter C. Carton, Stephen L. Hartsell, Dwaine L. Chambers, Roger R. Grass, Frank W. Ronich and Melvin D. Peters for Defendants and Respondents.

David L. Llewellyne, Jr., as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**FRANSON, P. J.**—We review a summary judgment rejecting a First Amendment challenge to the actions of the administrators and trustees of the Wasco Union High School District in excluding two books from the school curriculum. In granting the judgment, the trial court ruled that the subjective intent of the trustees in removing the books was irrelevant because the trustees were acting in a legislative capacity, and as legislators the trustees' intent was not subject to judicial inquiry.

For the reasons to be explained, we hold the school board was not acting in a legislative capacity because it was not enacting any rule of law or policy when it excluded the books from the curriculum; hence, the trial court should have inquired into the trustees' motives. We further hold under the federal and state rules governing summary judgments that a genuine issue of fact exists concerning the trustees' motives in excluding the books so that a reversal and remand for trial is required. Finally, to guide the trial court on remand, we define the constitutional standard to be applied in determining a school board's right to exclude books from a school curriculum.

### STATEMENT OF THE CASE

The summary judgment followed protracted and convoluted procedural litigation. On October 29, 1985, plaintiffs and appellants, a teacher, a student, a parent and a taxpayer in the Wasco Union High School District (hereafter appellants), filed a complaint and later a first amended complaint seeking preliminary and permanent injunctions against the administrators and trustees of the school district (hereafter respondents). Appellants sought to bar respondents from restricting the use of John Gardner's novel, Grendel, in the teacher's 12th grade English class. Appellants further sought a declaration that the restrictions imposed by respondents violated the First and Fifth Amendments to the United States Constitution and article I, sections 2 and 7 of the California Constitution.

Appellants' motion for a preliminary injunction was granted November 18, 1985. The injunction prevented respondents from requiring students to obtain parental permission slips pursuant to a "restricted book policy" before either reading Grendel or discussing it in class.

On May 12, 1986, respondents moved for a summary adjudication of issues in the first amended complaint and also requested that appellants be granted a permanent injunction restraining the enforcement of the restricted book policy. Respondents made the motion ostensibly to aid in settling the pending declaratory and permanent injunction action; however, appel-

lants opposed the motion because they believed it was "a deliberate and calculated attempt [by respondents] to circumvent the . . . [preliminary injunction]," and that respondents fully intended to expunge Grendel and another book—One Hundred Years of Solitude—from the school curriculum the following year.

Thereafter, when the 1986-1987 school year curriculum was adopted, both Grendel and One Hundred Years of Solitude by Gabriel Garcia Marquez were deleted from the curriculum.

In response to the books' deletion, appellants filed a supplemental complaint on June 25, 1986. The complaint challenged the decision to remove the books from the curriculum in three causes of action alleging: (1) respondents' arbitrary removal of the books violated appellants' right to receive and communicate ideas and information and to due process of law under the United States and California Constitutions; (2) removal of the books from the curriculum violated respondents' own policy concerning instructional materials and supplementary textbooks; and (3) respondents' policy concerning instructional materials and supplementary textbooks is unconstitutionally vague and overbroad. The supplemental complaint also sought declaratory and injunctive relief.

On October 3, 1986, respondents filed a motion for summary adjudication of issues alleged in the first amended complaint asking that certain material facts be declared to be undisputed. The trial court granted the motion and dismissed the first amended complaint as moot due to Grendel no longer being part of the curriculum.

On April 21, 1987, respondents filed a motion for summary judgment on all causes of action in the supplemental complaint. The motion was granted.

Appellants have appealed both the dismissal of the first amended complaint and the summary judgment on the supplemental complaint.

STATEMENT OF FACTS

Grendel was purchased by the Wasco Union High School District in October 1983. During the 1983-1984 school year, appellant Lee McCarthy used Grendel as part of her university preparation English 12A course of instruction. McCarthy used One Hundred Years of Solitude as independent reading in her English classes.

On January 25, 1985, the superintendent/principal of the Wasco Union High School District, respondent Douglas K. Fletcher, notified McCarthy

that both he and the vice principal of the high school, respondent Gerald Johnson, had reviewed Grendel and had found it "inappropriate for use with an entire 12A English class" because of a number of passages in the book. The review had been prompted by a student complaint based on religious grounds. In an administrative memorandum, Fletcher ordered that the book not be used with the entire class for instruction or discussion purposes and also prohibited its use with individual students unless the student first obtained written parental permission. However, this order was amended to permit the use of Grendel for class instruction provided signed parental permission slips were on file for the entire class. On February 14, 1985, the high school board of trustees approved these restrictions. Certain trustees also had reviewed Grendel and concluded that it contained extensive profanity, vulgarity and sordid imagery.

Fletcher issued an administrative directive entitled "RESTRICTED BOOKS POLICY" on May 21, 1985, which defined a restricted book as "[a]ny book so designated as independent reading that requires parent permission signature slips shall be on file in the administrative office prior to use by students." Grendel was the only restricted book under this policy.

On May 28, 1985, McCarthy received permission to proceed with class discussion and instruction of Grendel. At that time, 12 of her 13 students had filed signed parental permission slips and the remaining student, an 18-year-old, had given herself written permission. On November 18, 1985, McCarthy was able to teach Grendel without restriction due to the issuance of the preliminary injunction.

On March 13, 1986, a number of revised curriculum and instructional materials policies were adopted by the school board. These policies included district policy 1313 which lists criteria for the selection of instructional materials and supplementary textbooks.

On April 17, 1986, the school's English department met to formulate a book list for the 1986-1987 school year. At McCarthy's request, the list included Grendel and One Hundred Years of Solitude. The book list was submitted to Fletcher and Johnson for approval pursuant to district policy 1313.

After making their evaluations, Fletcher recommended the deletion of Grendel and One Hundred Years of Solitude from the curriculum; however, his recommendation was not transmitted to the board of trustees. Rather, Fletcher simply deleted the two books from the English department's proposed curriculum and submitted the modified curriculum to the board for approval.

On May 22, 1986, the board of trustees met and adopted the book list submitted by Fletcher as the English curriculum for the 1986-1987 school year. The board gave no statement of reasons for not including Grendel and One Hundred Years of Solitude in the curriculum.

## DISCUSSION

I. *The trial court erred in granting respondents' motion for summary judgment on the first cause of action of the supplemental complaint.*

The granting of a motion for summary judgment is proper only if the affidavits in support of the moving parties when strictly construed would be sufficient to sustain a judgment in their favor. (*Anderson* v. *City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 87 [135 Cal.Rptr. 127].) When the defendants are the moving parties, they have the burden of either conclusively negating an essential element of the plaintiffs' case or establishing a complete defense and thereby demonstrating that under no hypothesis is there a material factual issue which requires a trial. (*Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 661-662 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].)

Moreover, the defendants who move for summary judgment must prevail on their own affidavits and any admissions made by the plaintiffs. Therefore, unless the defendants' showing is sufficient as a matter of law, there is no burden on the plaintiffs to file affidavits or counteraffidavits showing they have a cause of action. (86 Cal.App.3d at pp. 662-663.)

The United States Supreme Court has spoken directly on summary judgment review in a First Amendment case challenging a school board's authority to exclude books from a school library: "In making our determination, any doubt as to the existence of a genuine issue of material fact must be resolved against . . . the moving party. [Citation.] Furthermore, . . . 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" (*Board of Education* v. *Pico* (1982) 457 U.S. 853, 863 [73 L.Ed.2d 435, 444, 102 S.Ct. 2799].) Accordingly, we must review the record to determine if the evidence forecloses "the *possibility*" that the board's decision to remove the books rested either upon disagreement with constitutionally protected ideas contained in the books or upon the board's desire to impose upon the students a religious orthodoxy *to which the board and its constituents* adhered. (*Id.* at p. 875 [73 L.Ed.2d at p. 452], italics added.)

In the present case, the trial court granted respondents' motion for summary judgment on the first cause of action of the supplemental complaint based on a finding that the board of trustees did not "abuse its

discretion in not including *Grendel* and *One Hundred Years of Solitude* in the required reading list for the English curriculum." In making this finding, the trial court ruled that it could not consider the individual motives and mental processes of the board members in excluding the books, but, rather, was required to look to the objective motivation of the board of trustees as a legislative body. The court accepted respondents' argument that the board was cloaked with a legislative immunity preventing judicial inquiry into the board members' motives or intent in excluding the books, citing *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d. 721, 723 [119 Cal.Rptr. 631, 532 P.2d 495] and *Soon Hing* v. *Crowley* (1885) 113 U.S. 703, 704 [28 L.Ed. 1145, 5 S.Ct. 730]. The court further held the burden was on appellants to establish an abuse of discretion on the part of the board, and the burden had not been met.[1]

■ The United States Supreme Court has long recognized that school boards have broad discretion in the management of school affairs. (*Board of Education* v. *Pico, supra,* 457 U.S. 853, 863 [73 L.Ed.2d at p. 444] (plur. opn. of Brennan, J.).) By and large, public education is committed to the control of state and local authorities. "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." (*Epperson* v. *Arkansas* (1968) 393 U.S. 97, 104 [21 L.Ed.2d 228, 234, 89 S.Ct. 266].) "[P]ublic schools are vitally important 'in the preparation of individuals for participation as citizens,' and as vehicles for 'inculcating fundamental values necessary to the maintenance of a democratic political system.'" (*Board of Education* v. *Pico, supra,* 457 U.S. 853, 864 [73 L.Ed.2d at p. 445] (plur. opn. of Brennan, J.).) Therefore, "local school boards must be permitted 'to establish and apply their curriculum in such a way as to transmit community values, . . .'" (*Ibid.*) "As a result, it is generally permissible and appropriate for local boards to make educational decisions based upon their personal social, political and moral views." (*Zykan* v. *Warsaw Community School Corp.* (7th Cir. 1980) 631 F.2d 1300, 1305.)

On the other hand, the power and discretion granted to school boards must be exercised in a manner which comports with the "transcendent imperatives" of the First Amendment. (*Board of Education* v. *Pico, supra,* 457 U.S. 853, 864 [73 L.Ed.2d at p. 445] (plur. opn. of Brennan, J.).) "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to

---

[1] The trial court seems to have mixed the burden of trial proof on the party asserting the affirmative of an issue (Evid. Code, § 500) with the burden of summary judgment proof (Code Civ. Proc., § 437c). As noted above, in a summary judgment proceeding the burden of proving entitlement to judgment is always on the moving party.

strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." (*Board of Education* v. *Barnette* (1943) 319 U.S. 624, 637 [87 L.Ed. 1628, 1637, 63 S.Ct. 1178, 147 A.L.R. 674].) It has therefore been recognized that "[s]tudents in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate'" although the First Amendment rights of those students "'are not automatically coextensive with the rights of adults in other settings,' [citation] and must be 'applied in light of the special characteristics of the school environment.'" (*Hazelwood School Dist.* v. *Kuhlmeier* (1988) 484 U.S. 260, 266 [98 L.Ed.2d 592, 602, 108 S.Ct. 562, 567].) Nevertheless, school boards are precluded from imposing a "'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." (*Pratt* v. *Ind. Sch. Dist. No. 831, Forest Lake* (8th Cir. 1982) 670 F.2d 771, 776 [64 A.L.R.Fed. 757].)

As the above discussion indicates, there exists an inherent tension between two essential functions of a school board, exposing young minds to the clash of ideas in the free marketplace and the need to provide our youth with a solid foundation of basic, moral values. (*Seyfried* v. *Walton* (3d Cir. 1981) 668 F.2d 214, 219 (conc. opn. of Rosenn, J.).) Thus, to insure that the school board's discretion is being exercised in a constitutionally permissible manner, it is necessary to examine the intent of the board members. As cogently explained in *Pico*: "Our Constitution does not permit the official suppression of *ideas*. Thus whether petitioners' removal of books . . . denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution. . . ." (*Board of Education* v. *Pico, supra,* 457 U.S. 853, 871 [73 L.Ed.2d at p. 449], fn. omitted.)

The trial court's conclusion that it could not examine the motive and intent of the individual board members was manifest error. Contrary to the court's finding, the board of trustees was not acting in a legislative capacity by formulating a rule or policy to be applied in future cases when it adopted the curriculum so that it would enjoy immunity from judicial inquiry into its motives. (Cf. *County of Los Angeles* v. *Superior Court, supra,* 13 Cal.3d 721; *Soon Hing* v. *Crowley, supra,* 113 U.S. 703.) Rather, the board was acting in an adjudicative-administrative capacity by purporting to apply established policy criteria to a given factual setting. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-35, fn. 2 [112

Cal.Rptr. 805, 520 P.2d 29]; cf. *Stanley* v. *Magrath* (8th Cir. 1983) 719 F.2d 279, 284.)

In light of the above conclusion, the grant of summary judgment on the first cause of action must be reversed unless we can find the error harmless under the circumstances of this case. The error is harmless only if we find as a matter of law that no genuine issue of fact exists as to the trustees' motives in excluding the books. While it is difficult and perhaps impossible to evaluate the board's motives where the board stated no reasons for excluding the books and where respondents successfully objected to the introduction of evidence of the board's motives throughout the litigation, nevertheless, to answer respondents' arguments on appeal, we shall examine the record and explain why the error cannot be deemed harmless.

In opposition to respondents' motion for summary judgment, appellants submitted the written evaluations of Grendel and One Hundred Years of Solitude prepared by Fletcher and Johnson. Although these evaluations expressed several legitimate educational concerns about the books' suitability for classroom teaching, including their vulgarity and profanity, the evaluations also contained statements which present a factual issue as to the administrators' real motives in excluding the books from the curriculum. In his analysis of Grendel, Fletcher stated the "subject of nihilism is presented with an emphasis on anti-government, anti-God, anti-religion and anti-personal dignity" and further "[t]his book is designed to break down a student's belief in God, government and the basic respect for the dignity of people." Johnson echoed Fletcher's opinion stating that the "book contains many anti-government, anti-God, and anti-religion statements." Johnson described One Hundred Years of Solitude as being "negative . . . to the Catholic religion." These statements may properly be viewed in the light of Fletcher's deposition testimony concerning the results of a board meeting held in 1985 to solicit community input about Grendel. According to Fletcher, 100 of the 10,000 residents of Wasco appeared at the meeting. Fletcher claimed the views expressed at that meeting represented a "majority of the community values in Wasco." When asked the basis for his conclusion, he stated, "[O]ne of the reasons would be that the Wasco Ministerial made a presentation that evening and as some people say, there's a church on every corner in Wasco. With the proliferation of churches in Wasco, [the] Wasco Ministerial Association tends to almost cover the town."

Viewing the inferences to be drawn from these statements in the light most favorable to appellants and giving appellants the benefit of any doubt as to the existence of a genuine issue of fact (*Board of Education* v. *Pico, supra,* 457 U.S. at pp. 862-863 [73 L.Ed.2d at p. 444]), it cannot be said that the books were excluded for legitimate educational reasons. Two rational

but conflicting interpretations as to motivation may be drawn from the opinions that Grendel and One Hundred Years of Solitude were anti-God, antireligious and anti-Catholic in the light of all of the circumstances in the record: (1) the administrators were merely trying to maintain a neutral classroom environment concerning religious orthodoxy by deleting books which criticize the religious views of the community—an arguably legitimate educational purpose, or (2) the administrators were acting to protect and advance the Christian ideology on behalf of the Wasco religious community—a patently illegitimate educational purpose.

■ As explained in *Stone* v. *Graham* (1980) 449 U.S. 39, 40 [66 L.Ed.2d 199, 201, 101 S.Ct. 192], the state, through its public schools, must " 'neither advance nor inhibit any religion or religious group . . . .' " Under the establishment clause of the First Amendment, a public school must be *neutral* insofar as any particular orthodoxy or ideology is concerned. (*Pratt* v. *Ind. Sch. Dist. No. 831, Forest Lake, supra,* 670 F.2d at p. 776.)

■ Respondents argue that Fletcher's and Johnson's evaluations should not be imputed to the board since they did not reflect the board's motives. Respondents point to the fact that four out of five of the board members, according to the members' declarations, had never seen or been advised of the administrators' evaluations. This inexplicable situation arose because Fletcher, rather than submitting the evaluations and his recommendation concerning the books to the board, essentially usurped the board's authority by deleting the books from the proposed curriculum before presenting it to the board. This was contrary to the board's own policy 1313, subdivision (2), which requires the superintendent to make his recommendations to the board for decision.

The constitutional protections afforded students under the First Amendment cannot be circumvented in this manner. If a decision by a school board would exceed constitutional limitations, it would equally exceed such limitations if made initially by the school administrators. (Cf. *Muir* v. *Alabama Ed. Television Com'n* (5th Cir. 1982) 688 F.2d 1033, 1052 (conc. opn. of Rubin, J.).) Therefore, in ruling on the propriety of the summary judgment and particularly in the light of the absence of any statement of reasons by the board members for deleting the books, the intent and motive of Fletcher and Johnson will be considered to be the intent and motive behind the board's decision.

Respondents argue that apart from Fletcher's and Johnson's evaluations of the books in 1987 pursuant to policy 1313, the record shows the board members excluded the books for constitutionally permissible reasons, citing to the November 1985 declarations by Fletcher, Johnson and certain board

members filed in support of the summary adjudication motion involving Grendel and the restricted book policy. After quoting selected portions from Grendel, the declarants expressed their opinions that the use of Grendel was "inappropriate" without parental permission because of its extensive "profanity and vulgarity" in the quoted passages and the "sordid nature of the images used." If we disregard the fact that these declarations pertained only to Grendel and not to One Hundred Years of Solitude and were filed in defense of the earlier restricted book policy rather than the curriculum decision (apparently made by different trustees), we again are presented only with an evidentiary conflict as to the board's motives in excluding the books which will not support the summary judgment.

In the final analysis, the trial court erred in granting a summary judgment absent a reviewable statement of reasons by the board for its adjudicatory decision. (Cf. *Pratt* v. *Ind. Sch. Dist. No. 831, Forest Lake, supra,* 670 F.2d at p. 778.) These reasons could either have been expressed at the board meeting when the decision to delete was made or as part of the summary judgment motion. The failure to do so compels a reversal in this case.

II. *The constitutional standard governing a school board's decision to exclude books from the curriculum.*

■ For the benefit of the trial court on remand, we will attempt to delineate the proper standard for evaluating the constitutional validity of a public school board's curriculum decisions. Neither the United States Supreme Court nor any appellate court in California has ruled on this precise issue.

In *Board of Education* v. *Pico, supra,* 457 U.S. 853, a plurality of the Supreme Court held that school boards could not remove books from school libraries simply because they disliked the ideas contained in those books. The board had characterized the books in a press release as " 'anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy,' " and had concluded " '[i]t is our duty, our moral obligation, to protect the children in our schools from this moral danger as surely as from physical and medical dangers.' " (*Id.* at p. 857 [73 L.Ed.2d at pp. 440-441].) After first noting the narrow context in which the issue was framed—the optional reading of library books rather than compulsory classroom reading—and also suggesting by way of dictum that if the court had been faced with a curriculum decision only, the school board might well have defended its claim of absolute discretion "by reliance upon their duty to inculcate community values" (*id.* at p. 869 [73 L.Ed.2d at p. 448]), the plurality opinion by Justice Brennan rejected the school board's claim that it must be allowed *"unfettered* discretion" to " 'transmit community values' " through the library. (*Ibid.*)

The court held that such a removal decision impinged upon the students' First Amendment right to receive information and ideas. (*Id*. at pp. 867-868 [73 L.Ed.2d at p. 447].) Respondents argue the present case is distinguishable from *Pico* in that it involves a curriculum decision, i.e., mandatory reading by students in a captive environment, and not a library decision involving optional reading as in *Pico, supra*.[2] Nevertheless, the present case does involve the students' right to receive information and ideas through classroom teaching and reading. Even Chief Justice Burger's dissent in *Pico* questions why a distinction should be made between classroom textbooks and library books. "It would appear that required reading and textbooks have a greater likelihood of imposing a ' "pall of orthodoxy" ' over the educational process than do optional reading." (457 U.S. at p. 892 [73 L.Ed.2d at p. 463].)

■ None of the majority opinions in *Pico, supra,* 457 U.S. 853, nor other Supreme Court cases advance the proposition that a school board has an *absolute* power to determine a school curriculum, although it is recognized that the board has broad authority " 'to establish and apply [its] curriculum in such a way as to transmit community values,' " and that " 'there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.' " (*Id*. at p. 864 [73 L.Ed.2d at p. 445].) Thus, school boards have the power to remove or restrict the use of books and other instructional materials which are "pervasively vulgar," profane or contrary to prevailing moral standards. (*Board of Education* v. *Pico, supra,* at p. 871 [73 L.Ed.2d at p. 449]; *Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675, 683 [92 L.Ed.2d 549, 558, 106 S.Ct. 3159].) The educational unsuitability of the books, of course, must be the true reason for the books' exclusion and not just a pretextual expression for exclusion because the board disagrees with the religious or philosophical ideas expressed in the books. (*Board of Education* v. *Pico, supra,* 457 U.S. at p. 870 [73 L.Ed.2d at p. 449].)

■ What is critical to the present case is that a school board does not have the power to advance or inhibit a particular religious orthodoxy as a "community value" no matter how prevalent or unpopular the orthodox view might be in the community. This is the essence of the establishment clause of the First Amendment, i.e., government *neutrality* with respect to

---

[2] Appellants respond that the record shows the school district did not simply remove the books from the required reading list; rather, the books were ultimately stricken from any use in the senior English class. Moreover, appellants assert that neither book was ever part of a *mandatory* reading list. All students were advised in writing at the beginning of the school year of their right to a substitute reading assignment at any time. One Hundred Years of Solitude had only been used as optional reading material, available in a small classroom library maintained by the English teacher. Yet the district removed the books from the shelves of available *optional* materials for student reading.

religion. (*Stone* v. *Graham, supra,* 449 U.S. 39, 40 [66 L.Ed.2d 199, 201]; *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]; *Grove* v. *Mead School Dist. No. 354* (9th Cir. 1985) 753 F.2d 1528, 1534.)

In *Pratt* v. *Ind. Sch. Dist. No. 831, Forest Lake, supra,* 670 F.2d 771, the Eighth Circuit affirmed the trial court's finding that the board's removal of films from the school curriculum violated the students' First Amendment rights. The court applied the analysis which had been employed by other courts for challenges to the removal of books from school libraries and concluded that a cognizable First Amendment claim exists if material is excluded from the curriculum to suppress an ideological or religious viewpoint with which the local authorities disagree. (Accord, *Minarcini* v. *Strongsville City School Dist.* (6th Cir. 1976) 541 F.2d 577.)

Recently, when faced with what it categorized as a curriculum decision, our high court applied a somewhat different standard from that adopted by the plurality in *Board of Education* v. *Pico* and the Eighth Circuit in *Pratt.* In *Hazelwood School Dist.* v. *Kuhlmeier, supra,* 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562], the Supreme Court evaluated a challenge to the editorial control exercised by school officials over the contents of a high school newspaper produced as part of the school's journalism curriculum. Noting that this situation "concern[ed] educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" (*id.* at p. 271 [98 L.Ed.2d at p. 605, 108 S.Ct. at p. 569]), the court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions *are reasonably related to legitimate pedagogical concerns.*" (*Id.* at p. 273 [98 L.Ed.2d at p. 606, 108 S.Ct. at p. 571], italics added.) In reaching this conclusion, the court characterized such school-sponsored expressive activities as part of the school curriculum "so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants . . . ." (*Id.* at p. 271 [98 L.Ed.2d at p. 605, 108 S.Ct. at p. 570].) Further, the court found that educators are entitled to exercise greater control over such activities "to assure that participants learn whatever lessons the activity is designed to teach" and that "readers or listeners are not exposed to material that may be inappropriate for their level of maturity." (*Ibid.*)

Since the court's discussion in *Hazelwood School Dist.* v. *Kuhlmeier, supra,* 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562] is not limited to a school newspaper but rather refers to a wide variety of "curriculum" deci-

sions, we believe the standard applied in that case should also be applied to the curriculum decision made here. This conclusion acknowledges the deference which is given to local school authorities regarding ordinary educational matters. " '[T]he courts have traditionally been reluctant to intrude upon the domain of educational affairs, not only in recognition of their lack of educational competence in such matters, but also out of respect for the autonomy of educational institutions.' " (*Seyfried* v. *Walton, supra,* 668 F.2d 214, 218 (conc. opn. of Rosenn, J.).) Therefore, respondents' decision to delete Grendel and One Hundred Years of Solitude from the curriculum will survive a First Amendment challenge so long as that decision is reasonably related to legitimate educational concerns. However, even under this broad standard, the school authorities' discretion is not unfettered. As we have explained, such a decision cannot be motivated by an intent to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." (*Board of Education* v. *Barnette, supra,* 319 U.S. 624, 642 [87 L.Ed. 1628, 1639].) In other words, school authorities cannot substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make educational choices. (*Zykan* v. *Warsaw Community School Corp., supra,* 631 F.2d 1300, 1306.)[3]

With respect to the definition of "legitimate pedagogical concerns," Education Code section 44806 enumerates what the Legislature has determined those concerns to be in California. This section provides that "Each teacher shall endeavor to impress upon the minds of the pupils the principles of morality, truth, justice, patriotism, and a true comprehension of the rights, duties, and dignity of American citizenship, . . . to teach them to avoid idleness, profanity, and falsehood, and to instruct them in manners and morals and the principles of a free government." Thus, so long as a curriculum decision is reasonably related to the goals set forth in the above section, it shall be deemed constitutionally permissible.

Although One Hundred Years of Solitude was used as independent reading as opposed to a class assignment, the Supreme Court's definition of curriculum as outlined in *Hazelwood* is broad enough to include it. Its use was "supervised by faculty members and designed to impart particular

---

[3] In *Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47 [243 Cal.Rptr. 494], the court noted that the broad power to censor expression in school-sponsored publications for pedagogical purposes recognized in *Hazelwood School Dist.* v. *Kuhlmeier, supra,* 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562] is not available to California's educators. However, this difference is not due to California school authorities having less discretion with respect to curriculum decisions in general. Rather, the discrepancy is caused by the constraints placed on school officials with respect to student-produced publications by Education Code section 48907. This section, however, has no effect on general curriculum decisions and, therefore, our analysis on the correct standard is applicable under both the First Amendment to the United States Constitution and article I, section 2 of the California Constitution.

knowledge or skills to student participants . . . ." (*Hazelwood School Dist. v. Kuhlmeier, supra,* 484 U.S. 260, 271 [98 L.Ed.2d 592, 605, 108 S.Ct. 562, 570].)

There is one statement in *Hazelwood, supra,* that needs clarification. After holding that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as the educators' actions are "reasonably related to legitimate pedagogical concerns," the court then concluded, "It is only when the decision to censor . . . has *no valid educational purpose* that the First Amendment is so 'directly and sharply implicate[d],' [citation] as to require judicial intervention to protect students' constitutional rights." (*Hazelwood School Dist. v. Kuhlmeier, supra,* 484 U.S. at p. 273 [98 L.Ed.2d at pp. 606, 607, 108 S.Ct. at p. 571], italics added.) We do not interpret this statement to mean that regardless of the religious, political or philosophical reasons why a school board may exclude a book from a curriculum, the board's exercise of discretion will be upheld so long as the board expresses some educational reason for excluding the book. This interpretation would permit school officials to camouflage religious "viewpoint discrimination" (*Hazelwood, supra,* at pp. 286-287 [98 L.Ed.2d at p. 615, 108 S.Ct. at p. 578 (dis. opn. of Brennan, J.)) and would be tantamount to vesting an absolute discretion in the board to determine the curriculum which we do not believe *Hazelwood* intended. Thus, the true motives of the school board members must be examined to answer a First Amendment challenge.

III. *Respondents' removal of the books without teacher initiation and without referral to a professional staff committee did not violate the board's policy.**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

IV. *Respondents' curriculum evaluation policy is not unconstitutionally vague and overbroad.*

■ Appellants contend respondents' criteria for evaluating curriculum material as set forth in policy 1313, subdivision (1) are unconstitutionally vague and overbroad. This issue was raised in the third cause of action of appellants' supplemental complaint.

Policy 1313 provides that prior to adoption by the board of trustees all instructional material and supplementary textbooks requested shall be:

---

* See footnote, *ante,* page 130.

". . . carefully examined and evaluated by the instructor(s) and department head(s) concerning the proper forms and the following criteria: [¶] (a) Subject coverage. [¶] (b) Relevance to course of study. [¶] (c) Vocabulary level. [¶] (d) Interest level. [¶] (e) Treatment of controversial issues. [¶] (f) Nature and extent to which material adversely reflects upon persons because of their race, religion, color, national origin, ancestry, gender or occupation. [¶] (g) Style and readability. [¶] (h) Cost. [¶] (i) Format. [¶] (j) Strengthens the principles of freedom as outlined in the U.S. Constitution and other great documents of our country. [¶] (k) The communities [sic] social, moral and political values. [¶] (l) Appropriateness of the subject matter to the class for which use is intended. [¶] (m) General literary and/or artistic value. [¶] (n) Suitability of content and vocabulary to the age of the reader."

Appellants contend at least five of the above criteria allow for nothing other than subjective interpretation and that the policy as a whole fails to direct how to weigh the criteria or how the conclusions will be reviewed by school officials. However, appellants specify only subdivisions (e), (f), and (j) as being impermissibly vague.

As noted above, local school boards are vested with broad discretion in the area of curriculum decisions in recognition of their expertise in this area and their role of transmitting community values to their students. Thus, it is within this framework that appellants' objections to policy 1313 must be evaluated.

Appellants contend that factor (e), "Treatment of controversial issues," is impermissibly vague in that "virtually everything is susceptible to this criterion." However, analyzing certain aspects of proposed educational materials using criteria which appellants would classify as vague is inherent in the curriculum selection process. In general, literary criticism is not susceptible of quantification. Further, as noted above, due to the formative purpose of secondary school education, school administrators are required to present their students with materials which, in their opinion, will best transmit the basic values of the community. Thus, some subjective interpretation is necessarily included in curriculum decisions such as those at issue here. In light of these considerations, factor (e) is not impermissibly vague. (Cf. *Grayned v. City of Rockford* (1972) 408 U.S. 104, 110, 112 [33 L.Ed.2d 222, 230, 92 S.Ct. 2294].)

Although factors (f) and (j) also may require some subjective interpretation, they reflect the Legislature's criteria for school curriculum as stated in the Education Code. Under Education Code section 44806, each teacher must endeavor to "impress upon the minds of the pupils the principles of

. . . patriotism, and a true comprehension of the rights, duties, and dignity of American citizenship . . . and to instruct them in . . . the principles of a free government." Subdivision (j) parallels this directive in providing that the material being evaluated "Strengthens the principles of freedom as outlined in the U.S. Constitution and other great documents of our country."

Similarly, factor (f) is taken from Education Code section 51501. That section provides that "[n]o textbook, or other instructional materials shall be adopted by the state board or by any other governing board for use in the public schools which contains any matter reflecting adversely upon persons because of their race, sex, color, creed, handicap, national origin, or ancestry."

Therefore, the inclusion of subjective as well as objective criteria in policy 1313 does not render it unconstitutionally vague. Out of the 14 criteria, appellants object to 5 as allowing subjective interpretation. Considering the nature of the required analysis, however, the policy is reasonably specific and definite. (Cf. *Grayned* v. *City of Rockford, supra,* 408 U.S. 104, 110, 112 [33 L.Ed.2d 222, 228-230].) The trial court's grant of summary judgment as to the third cause of action of appellants' supplemental complaint should therefore be affirmed.

V. *The trial court properly dismissed the first amended complaint as moot.*

■ Appellants contend the trial court erred in dismissing their first amended complaint as moot after Grendel was removed from the curriculum. This complaint challenged both the restrictions placed on Grendel and the restricted book policy itself.

When Grendel was removed from the curriculum, the challenge to the specific restrictions which had been placed on it became moot, and those causes of action were therefore properly dismissed. However, this dismissal did not deprive appellants of the opportunity to challenge respondents' actions concerning Grendel due to the existence of the supplemental complaint.

With respect to the policy itself, it merely defines a restricted book as one which requires parental permission slips before it can be used as part of the curriculum. Thus, the decision to so restrict the use of a book falls within the broad discretion granted to the local school board concerning curricu-

lum matters. However, as discussed above, this discretion must be exercised within constitutional limits. Therefore, because it is the application of this policy which must withstand constitutional scrutiny, the first amended complaint was properly dismissed when the policy was no longer applicable.

The judgment is reversed as to the first cause of action of the supplemental complaint. The judgment is affirmed in all other respects. Appellants to recover their costs on appeal.

Hamlin, J., and Ardaiz, J., concurred.

A petition for a rehearing was denied February 8, 1989, and respondents' petition for review by the Supreme Court was denied March 30, 1989.